1

**LINDEMANN LAW FIRM, APC**
BLAKE J. LINDEMANN, SBN 255747
2    433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
3    Telephone:  (310)-279-5269
Facsimile:   (310)-300-0267
4    E-mail:      blake@lawbl.com

5    Attorneys For Plaintiffs
HELEN JIA, SARAH SORMILLON
6    AND ALL THOSE SIMILARLY
SITUATED
7

8                **UNITED STATES DISTRICT COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11   HELEN JIA, an individual; SARAH            Case No. _____
SORMILLON, an individual; and all those
12   similarly situated,

13
Plaintiffs,
14
v.                                          **ORIGINAL COMPLAINT –
15                                               CLASS ACTION**

16   NERIUM INTERNATIONAL, LLC, a
Texas Limited Liability Company;
17   NERIUM SKIN CARE, INC., a Texas
Corporation, NATURAL
18   TECHNOLOGY, INC dba                         **[DEMAND FOR JURY TRIAL]**
NATURTECH; JEFF OLSON, an
19   individual; RENEE OLSON, an
individual; AMBER OLSON ROURKE,
20   an individual; MICHAEL SHOUHED, an
individual; KELLY HEFERNAN; and
21   DOES 1-10,
22
23
24
Defendants.
25

26

27

28

I.   **INTRODUCTION TO THE CASE**

1.      Nerium International, LLC ("Nerium") and their conspirators represented to plaintiffs Helen Jia and Sarah Sormillon (collectively, the "Plaintiffs") that Nerium provides a business opportunity that can build "a dream lifestyle" and that Plaintiffs could be financially independent by virtue of selling Nerium's "age-defying" creams.  But in reality, these promises of riches, wealth, and gifts couldn't be further from the truth. Characterized by some of its former employees as a scam and a cult, Nerium touts that it has generated one billion dollars in cumulative sales after just four years.  These sales are based on the recruitment of new brand partners into the pyramid scheme that Nerium has amassed.

2.      Plaintiffs did <u>not</u> make money as promised. As with the case of thousands of Nerium distributors before and after them, the Plaintiffs failed. Plaintiffs and those similarly situated, failed even though they were committed and put in the time and effort. They failed because they were doomed from the start by a Nerium marketing plan that systematically rewards recruiting distributors over the sale of products.

3.      A significant percentage of Nerium distributors (otherwise characterized by Nerium as brand partners) average net <u>losses</u>.  In 2014 for example, only 1.4% of Nerium Brand partners made gross sales of over $10,000 which did not even factor in all the expenses (and purchase of products) in the Nerium opportunity.  Thus, nearly all Nerium Brand Partners do not earn net profit.

4.      Defendants run an illegal pyramid scheme. Defendants take money in return for the right to sell products that are falsely advertised and do not provide the health benefits promised, and reward the select few for recruiting other participants into the pyramid.

5.      Accordingly, Plaintiffs, for themselves, all others similarly situated, and the general public, allege:

II.    **TYPE OF ACTION**

6.    Plaintiffs sue for themselves and for all persons who were Nerium participants from 2010 until the present under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), California's Unfair Competition Law (Business and Professions Code §17200 et seq.), False Advertising Law (Business and Professions Code §17500), and Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. against all defendants for the operation and promotion of an inherently fraudulent endless chain scheme.

III.    **PARTIES**

7.    Plaintiff Helen Jia ("Jia"), is and at all relevant times, has resided in the County of Los Angeles, State of California.

8.    Plaintiff Sarah Sormillon ("Sormillon"), is and at all relevant times, has resided in the County of Los Angeles, State of California.

9.    Defendant Nerium International, LLC ("Nerium") is a Texas limited liability company that does business in the State of California and at 4004 Belt Line Road, Suite 112, Addison, TX 75001.

10.    Defendant Nerium Skincare, Inc. ("Skincare") is a Texas corporation that does business in the State of California and at 4004 Belt Line Road, Suite 112, Addison, TX 75001.

11.    Defendant Jeff Olson ("Jeff") is the Chief Executive Officer of Nerium. Jeff is the founder of Nerium and Marketing, Chairman, and CEO.  He is at or near the top of the pyramid operated and promoted by the Defendants, and he actively participates in, promotes, and profits from Nerium's pyramid scheme.

12.    Defendant Renee Olson ("Renee") is the Chief Leadership Officer of Nerium.  She is at or near the top of the pyramid operated and promoted by the Defendants, and she actively participates in, promotes, and profits from Nerium's pyramid scheme.

13.     Defendant Amber Olson Rourke ("Amber") is the Chief Marketing Officer of Nerium.  She is at or near the top of the pyramid operated and promoted by the Defendants, and she actively participates in, promotes, and profits from Nerium's pyramid scheme.

14.     Defendant Michael Shouhed ("Shouhed") is an individual and a resident of Los Angeles County, California.  He actively participates in, promotes, and profits from Nerium's pyramid scheme.

15.     Defendant Kelly Hefernan ("Hefernan") is an individual and a resident of Los Angeles County, California.  She actively participates in, promotes, and profits from Nerium's pyramid scheme.

16.     Shouhed and Hefernan were involved in promoting the Nerium opportunity using the likeness of celebrities, including without limitation, Ray Liotta.

17.     Jeff, Renee, Amber, Shouhed, and Heffernan, are referred to collectively hereinafter, as the "Individual Defendants."

## IV.   **JURISDICTION AND VENUE**

18.     Jurisdiction is conferred upon this Court because Defendants do business in this judicial district, they hold themselves out and market their business opportunity and products to this jurisdiction, and they actually conduct significant transactions in this jurisdiction.  Under Plaintiff's California state law claims, more than 75% of those affected in the class (and perhaps more persons) are residents of the State of California. Jurisdiction exists over the RICO causes of action and Federal Securities claim, pled in the alternative.

19.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, a substantial part of the property that is the subject of this action is situated here, and Defendants are subject to personal jurisdiction, in this District.

20.     Defendant Nerium is subject to the jurisdiction of this Court. Nerium has been engaged in continuous and systematic business in California.  In fact, many of Nerium's representative business activities originate from California.

21.     Nerium has committed tortious acts in this State.

22.     Each of the Defendants named herein acted as a co-conspirator, single enterprise, joint venture, co-conspirator, or alter ego of, or for, the other Defendants with respect to the acts, omissions, violations, representations, and common course of conduct alleged herein, and ratified said conduct, aided and abetted, or is other liable.  Defendants have agreements with each other, and other unnamed Director co-conspirators and have reached agreements to market and promote the Nerium pyramid as alleged herein.

23.     Defendants, along with unnamed Director co-conspirators, were part of the leadership team that participated with Nerium, and made decisions regarding: products, services, marketing strategy, compensation plans (both public and secret), incentives, contests and other matters.  In addition, Defendants and unnamed co-conspirators were directly and actively involved in decisions to develop and amend the compensation plans.

24.     Plaintiffs are presently unaware of the true identities and capacities of fictitiously named Defendants designated as DOES 1 through 10, but will amend this complaint or any subsequent pleading when their identities and capacities have been ascertained according to proof. On information and belief, each and every DOE defendant is in some manner responsible for the acts and conduct of the other Defendants herein, and each DOE was, and is, responsible for the injuries, damages, and harm incurred by Plaintiffs. Each reference in this complaint to "defendant," "defendants," or a specifically named defendant, refers also to all of the named defendants and those unknown parties sued under fictitious names.

25.     Plaintiffs are informed and believe, and thereon allege that, at all times relevant hereto, all of the defendants together were members of a single association,

with each member exercising control over the operations of the association.  Each reference in this complaint to "defendant," "defendants," or a specifically named defendant, refers also to the above-referenced unincorporated association as a jural entity and each defendant herein is sued in its additional capacity as an active and participating member thereof. Based upon the allegations set forth in this Complaint, fairness requires the association of defendants to be recognized as a legal entity, as the association has violated Plaintiff and Class Members' legal rights.

26.    Plaintiffs are further informed and believe and thereon allege that each and all of the acts herein alleged as to each defendant was authorized and directed by the remaining defendants, who ratified, adopted, condoned and approved said acts with full knowledge of the consequences thereof, and memorialized the authority of the agent in a writing subscribed by the principal.

27.    Plaintiffs are informed and believe and thereon allege, that each of the defendants herein agreed among each other to commit the unlawful acts (or acts by unlawful means) described in this Complaint.

28.    The desired effect of the conspiracy was to defraud and otherwise deprive Plaintiffs and Class Members (as hereinafter defined) of their constitutionally protected rights to property, and of their rights under other laws as set forth herein. Each of the defendants herein committed an act in furtherance of the agreement. Injury was caused to the Plaintiffs and Class Members by the defendants as a consequence.

V.   **FACTS**

   **A.    Nerium Operates A Pyramid Scheme**

29.    Nerium was founded back in 2011 by co-defendant Jeff Olson ("Olson").  Olson previously created and operated the People's Network, another MLM Company that has since cratered.

30.    Nerium has stated gross revenues of 516 million dollars in 2015.

1       31.    Nerium is involved in manufacturing so-called "age-defying" creams

2   and pills.

3       32.    Brand Partners, who serve the role of distribution for Nerium

4   (heretofore referred to as "Brand Partners" or "Distributors") have complained that

5   because there are so many distributors selling Nerium's products, the market is

6   flooded with too much product.  Many Brand Partners have also reported that they

7   have had a hard time selling the products because the Products smelled bad and did

8   not provide the health benefits marketed.  Other Brand Partners have stated that

9   there are much better products out there for a fraction of the price.

10       33.    Nerium admits in its seminars that it is loading inventory, but

11   misrepresents that its loading is "free" even though there is nothing free about

12   shipping fees, product fees, and handling fees.

13       34.    Defendant Nerium generates revenue using a product-based pyramid

14   scheme. Nerium sells its products to Nerium Partners who recruit multiple, new

15   Nerium Partners. They, in turn, purchase Nerium products and recruit yet more

16   Nerium Partners in an ever-growing pyramid.

17       35.    Nerium uses the lure of potential future bonuses, commissions, prizes

18   (like iPads and Lexus cars) and "limitless opportunities" to motivate active

19   participation of Nerium Partners.

20       36.    Defendant Nerium sells a skin care product in the form of a skin cream

21   named "Nerium AD."

22       37.    Nerium claims the key active ingredient in Nerium AD is an extract of

23   the Nerium Oleander plant.

24       38.    Nerium claims oleander possesses "remarkable properties" for

25   improving the appearance of damaged skin and that it produces "remarkable age-

26   defying results when applied to the skin." Nerium purports to have "stumbled upon"

27   those properties in a "true accidental discovery" and then scientifically "harnessed

28   the power of oleander" in Nerium AD skin cream.

39.     Nerium claims that the use of Nerium AD skin cream produces dramatic improvements in the look of a person's skin, and that it is "proven" to dramatically reduce the appearance of wrinkles, skin discoloration, poor skin texture, poor skin tone, enlarged pores and aging loose skin.

40.     Nerium markets Nerium AD as purportedly being backed by "Real Science" and as producing "Real Results."

41.     Specifically, the actual labeling of the product falsely claims "age-defying supplement," "helps protect against common age-related mental decline with a groundbreaking formula that includes our exclusive, patented EHT extract, a natural mixture of bioactive molecules isolated from coffee, promotes better cognitive function and overall brain health, improves memory and recall, fortifies and strengthens natural brain functions, increases focus and mental alertness, protects and supports neuronal networking, enhances the body's natural energy stores, and boosts the body's immune system.

42.     Nerium claims the purported results achieved by using Nerium AD are "based on proven science and actual customer success."

43.     On information and belief, Nerium's principle marketing strategy is to present "before and after" photographs showing purported dramatic results achieved by people who have allegedly used Nerium AD skin cream.

44.     On information and belief, Nerium, by and through its agents, provides those "before-and-after" photographs and related marketing materials to Nerium Partners for marketing, inter alia, on web sites and social networking platforms such as Facebook, Twitter, Pinterest, Instagram, Google+ and others.

45.     On information and belief, the purported "real results" and "actual customer success" of using Nerium AD shown in those "before and after" photographs are fabricated – that is, they are not real results.

46.    On information and belief, Nerium's claims of dramatic skin improvements achieved by using Nerium AD skin cream have not been validated or confirmed by any recognized or peer reviewed scientific studies.

47.    On information and belief, Nerium uses "before and after" photos with fabricated results to fraudulently induce Brand Partners and consumers to purchase Nerium AD skin cream and to entice them to become Nerium Partners.

48.    On information and belief, Defendant Nerium and the Defendant Nerium Partners, themselves and/or by and through their respective agents, have used, the name, likeness, image, identity and persona of certain star personalities like Ray Liotta to advertise, market and promote the sale of Nerium AD and to recruit new Nerium Partners, for Defendants' commercial benefit and gain.

49.    One former marketing employee of Nerium claimed on the website, Glassdoor.com on May 28, 2016, that "[Nerium] preaches these great values and even print cards. Its a joke among staff that they are never followed. Its a multi-level MARKETING company remember. Its [sic] all propaganda. Spend tens of thousands (literally) on redo-ing signs and bags for products because the color is wrong (not close enough to Tiffany blue ... sorry, Nerium blue) but cut staff benefits."

50.    On March 25, 2015, another former employee of Nerium claimed as to the "cons" of the organization to Glassdoor.com: "Too many to list. They brainwash everyone in their organization into thinking that they own their own business. Or that it you want it you can attain it, you just have to believe. Well believe me, it['']s a SCAM. There is 0 future.  **Advice to Management**. … You're taking advantage of people every step of the way."

51.    On October 24, 2014, another former employee of Nerium posted on Glassdoor.com, "do NOT NOT NOT get sucked into this MLM cult."

52.    Another Brand Partner of Nerium complained on Glassdoor.com as to the cons of Nerium: "Where do I start? The product is very expensive and it's hard

1  to get people to keep buying it, you have to convince them to come on board to sell

2  it so they can get theirs cheaper or free, etc. Not everyone wants to sell and you get a

3  lot of no's. Someone can get botox and juvederm cheaper than they can get a few

4  months of this. The before/after pics always seem to be in different light so it's hard

5  to say if it's still working. It didn't work for me or the 3 people I sold it to. The ones

6  that are really into it, it seems like a cult almost, like the church of Nerium. Glory be

7  to God and Nerium is what they say. It's laughable. You get a "free" Lexus that they

8  pay 500.00 towards. But if your sales go down, membership goes down, etc you are

9  stuck with a lease. I'd rather have the money. Just don't do it. These people are

10  borderline nuts."

11  53.    Another former employee commented on Glassdoor.com: "[not] just a

12  pyramid scheme…Some of the training techniques are about the same as

13  brainwashing…"

14  54.    The starter pack for Nerium is approximately $600, which includes

15  supplements, mind enhancement, firming body contour, and AD night cream.

16  Difference variants of the starter pack are offered.

17  55.    Ordinary customers can purchase the products on websites like Ebay or

18  Amazon, for considerably less than a brand partner pays for the products.

19  56.    By signing persons up, Nerium is frontloading "Brand Partners" with

20  significant product.

21  57.    A Brand Partner is required to bring in 200 points for customers, or 80

22  points if a person purchase the products himself/herself.  The main driver is for

23  Brand Partners to recruit other Brand Partners.

24  58.    Only through recruiting, does a Brand Partner receive "team

25  commissions," which is where a Brand Partner obtains residual income paid out up

26  to 10 levels.  In other words, team commissions pay 10 levels above the pyramid

27  when new brand partners are signed up.

28

ORIGINAL COMPLAINT – CLASS ACTION

59.    Nerium falsely and misleadingly claimed the following to Plaintiffs and the Class:

- You can receive a "live better bonus of $150,000."
- "With Nerium International, you can have everything."  Further, "[o]ur program allows you the life-changing career to tailor your career to unlimited success, your way...  They incentivize you to become the best person you can be...  I quickly earned my Lexus...  I got an i-pad bonus…  You can pay off your student loans…  I wanted to retire my parents."
- You "get paid to party." The representation "[i]f you want your future on your terms, get with your referring brand partner for more information."
- CEO Jeff Olson claims, "[w]e have people who've earned their iPads, they've earned their cars, earned dream vacations, great incomes, six figure incomes, people making adult incomes, people making incomes that put them in the top 5 percentile of the United States."
- While Nerium's website professes that it provides its distributors with financial freedom, its outdated, hard-to-find, U.S. 2013 Income Declaration is misleading affirmatively, and by omission.
- "I wanted to be able to get out there and retire my parents. I wanted to be able to go out there and make an impact in their life, and Nerium gave me that opportunity."
- "When you don't worry about money anymore, you don't have to stress out over the bills, you know it's about the choices you have – the freedom you have."

- "Nerium has just completely changed my life; everything about my life has gotten completely 100% better. We recently purchased our dream home and it's absolutely gorgeous."

60.     Nerium constitutes an exploitive money transfer scheme. Contrary to Nerium's representation that it is "a proven system for people to make significant amount of money," the average income of Nerium Brand Partners reflects that nearly every brand partner in Nerium makes minimum wage to nothing.

61.     If Nerium's products were so effective, partners would not be marketing benefits from people who are not even using the product.

62.     Nerium asserts it has a return policy of 30 days, but Brand Partners have to pay for shipping and handling fees.

63.     The Wyoming Attorney General has asserted distributors used prohibited income representations, the SEC has asserted Nerium has marked payments to salespeople as assets instead of expenses, and Nerium settled 400 lawsuits in just the State of Missouri.

64.     TINA.org, a non-profit organization, conducted an investigation into Nerium.  The investigation revealed that Nerium and its high-level Brand Partners were engaged in a deceptive marketing campaign for both the Nerium business opportunity and Nerium's products.

65.     First, TINA.org found that Nerium, through its distributors, is using a plethora of deceptive and unsubstantiated health and disease-treatment claims to sell its products. In fact, TINA.org compiled over 100 examples of unsubstantiated health and disease treatment claims made about Nerium products, such as being able to treat, cure, or alleviate the symptoms of autism, post-traumatic stress disorder, Alzheimer's disease, Parkinson's disease, psoriasis, eczema, acne, and rosacea. The examples are available at https://www.truthinadvertising.org/nerium-health-claims-database/.

66.     Though the company tries to give the illusion that it has robust scientific support for the health claims made about its products, none of it satisfies the required substantiation to make such health and disease-treatment claims.

67.     In short, Nerium does not have competent and reliable scientific evidence in the form of clinical trials that are placebo controlled, randomized, and double-blind to substantiate the claims at issue.

68.     Second, TINA.org's investigation revealed that Nerium and its distributors are using deceptive, atypical, and unsubstantiated income claims regarding the financial gains consumers will achieve by becoming distributors. For example, Nerium advertises that its distributors can become millionaires and earn incomes that can put them in the top 5% of U.S. income earners. Not only are such results not typical, but marketing claims that boast atypical results are made without clearly and conspicuously providing appropriate income disclosures. TINA.org compiled over 100 instances of these types of income claims, which are all available at https://www.truthinadvertising.org/nerium-incomeclaims-database/.

69.     The focus of Nerium is getting Brand Partners to purchase a starter pack and get them to sign up new brand partners to purchase a starter pack to endless scheme.

70.     Nerium represents "[l]iving life on your own terms," "enjoying financial freedom," "having fun and helping others to have fun," "you can take control of your destiny with this opportunity," "[w]e have a simple proven system," and "what a better way to earn part time to full time income with products you love."

71.     Rewards paid in the form of cash bonuses, where primarily earned for recruitment, as opposed to merchandise sales to consumers, constitute a fraudulent business model.  *See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014).

**B.      Distributors Are Unable To Sell Nerium Products For A Profit**

72.     Brand Partners are unable to consistently sell Nerium products for a profit for many reasons. First, the products are overpriced.  Interchangeable products are available online or in brick-and-mortar stores for amounts far less than Nerium's suggested retail price, and even lower than its wholesale prices.

73.     Second, Nerium's products themselves are available online for the wholesale price or less.  That these products are sold below the wholesale price makes it difficult for Brand Partners to sell the products for a profit. Moreover, many of these sales are likely made by current or former Brand Partners desperately trying to offload excess product at whatever price they can get, which further supports the proposition that Brand Partners Inventory Load and that the Nerium products are overpriced.

74.     Third, Nerium prohibits Brand Partners from selling the products in the only forum for a where Brand Partners could reasonably expect to sell enough product to make a meaningful profit: the internet. Some examples of these prohibited websites include, but are not limited to: eBay, Amazon or Craigslist. In addition, Nerium forbids its Brand Partners from selling Nerium products at almost all brick-and-mortar establishments. Nerium seeks to limit the Distributors to one-on-one situations in private locations (such as the Brand Partner's or a friend's home), but achieving significant, profitable retail sales by this method is extremely difficult.

75.     Plaintiffs do not contend that Brand Partners make no retail sales at all. But Plaintiffs do allege that relatively little of the revenues received by Brand Partners—including both money paid them by Nerium and proceeds from retail sales—comes from retail sales, and the vast majority comes from Brand Partners' payments to Nerium.  Thus, the Brand Partners are primarily feeding off each other.

76.     Nerium also makes false and/or inadequate income disclosures in that in many instances, it does not disclose income of those who are distributors, or provides statements of income that are false, and/or misleading, that affirmatively

represent a profitable business opportunity, when there is no profit to be made, and nearly all participants in fact, lose money.

77.     Because Nerium pays the executives at the top of the pyramid exorbitant incomes and because little non-Distributor money comes into the scheme to pay Brand Partners, the Brand Partners at the bottom of the pyramid must lose money. These losses are borne out by Nerium's own financial disclosures and the experiences of the Plaintiffs and multiple other Brand Partners.

**C.     The Individual Defendants and Nerium Promote the Pyramid**

78.     The Individual Defendants are persons at the top of Nerium's pyramid. All of the Individual Defendants achieved ranks of top executive.  They are in the top 1% of Distributors who make the most lucrative bonuses. They actively participate in the Nerium pyramid scheme, and they profit from the compensation plan at the expense of the vast majority of Brand Partners.

79.     Nerium and the Individual Defendants promote the pyramid scheme and make misleading claims of financial success.

80.     In coordination with Nerium, the Individual Defendants have flooded the internet with promotional materials designed to lure in new Brand Partners. Nerium and the Individual Defendants promote the scheme as a lawful program that, with sufficient hard work, virtually guarantees financial success. Nerium and the Individual Defendants promote Nerium as a reliable source of significant income.

81.     Jeff is the Chief Executive Officer of Nerium.  Jeff contrived, prepared, set up, and developed the structure and parameters of the Brand Partners' program, and the Brand Partners' endless chain scheme alleged herein above. As a top executive, visionary leader, and member of the Board for Nerium, Jeff has been, and is currently responsible for operating the Nerium endless chain scheme and directing others on the operation of the Nerium endless chain scheme. Jeff is also the very public face of Nerium. Promotional materials describe Jeff as the leader of the Nerium opportunity. Jeff's photograph and biography are prominently placed on

1   Nerium's website and Nerium's product brochures, promotional materials, and

2   documents with Jeff's information is provided to recruits. Jeff travels extensively on

3   behalf of Nerium to regularly give speeches and make appearances at seminars and

4   other events for Nerium affiliates and recruits, all the while touting the benefits and

5   opportunities for affiliates under the Nerium program.

6        82.    Renee is the Chief Leadership Officer of Nerium.  Renee contrived,

7   prepared, set up, and developed the structure and parameters of the Brand Partners'

8   program, and the Brand Partners' endless chain scheme alleged herein above. As a

9   top executive, visionary leader, and member of the Board for Nerium, Renee has

10   been, and is currently responsible for operating the Nerium endless chain scheme

11   and directing others on the operation of the Nerium endless chain scheme. Renee's

12   photograph and biography are prominently placed on Nerium's website and

13   Nerium's product brochures, promotional materials, and documents with Renee's

14   information is provided to recruits. Renee travels extensively on behalf of Nerium to

15   regularly give speeches and make appearances at seminars and other events for

16   Nerium affiliates and recruits, all the while touting the benefits and opportunities for

17   affiliates under the Nerium program.

18        83.    Amber is the Chief Marketing Officer of Nerium.  Amber contrived,

19   prepared, set up, and developed the structure and parameters of the Brand Partners'

20   program, and the Brand Partners' endless chain scheme alleged herein above. As a

21   top executive, visionary leader, and member of the Board for Nerium, Amber has

22   been, and is currently responsible for operating the Nerium endless chain scheme

23   and directing others on the operation of the Nerium endless chain scheme. Amber's

24   photograph and biography are prominently placed on Nerium's website and

25   Nerium's product brochures, promotional materials, and documents with Renee's

26   information is provided to recruits. Amber travels extensively on behalf of Nerium

27   to regularly give speeches and make appearances at seminars and other events for

28

1  Nerium affiliates and recruits, all the while touting the benefits and opportunities for
2  affiliates under the Nerium program.

3      84.    To sell the financial-success promise, Nerium and the Individual
4  Defendants flaunt the wealth of the highest-ranked Brand Partners and those few
5  insiders at the top of the pyramid, as examples of the riches that await new
6  participants, if only they will work hard enough (i.e., tirelessly recruit new
7  Distributors).

8      85.    The Individual Defendants have produced videos and made statements
9  via the internet knowingly promoting Nerium's pyramid scheme and touting the
10  financial rewards supposedly available to participants.  Each of these statements
11  furthered the pyramid scheme by encouraging persons to become Brand Partners and
12  by encouraging Distributors to remain Brand Partners and pursue the Nerium business
13  opportunity.

14      86.    The Individual Defendants aided and abetted the torts listed in this
15  Complaint because they knew that Nerium and Skincare's conduct constitutes a
16  breach of duty and gives substantial assistance or encouragement to the other to so
17  act.

18      87.    Each of the individual defendants reviewed the business plan, the
19  website of Nerium, the financials, and recognized that the business plan constitutes a
20  pyramid scheme.

21      88.    The Individual Defendants were also facilitating orders for an unlawful
22  pyramid scheme and that Nerium's website made false, misleading, and deceptive
23  claims and engaged in unfair business practices.

24      89.    Finally, the Individual Defendants knew that the money being paid by
25  the consumers was for the purposes of participation in the endless chain.

26      90.    Each of the Individual Defendants authorized Nerium and Skincare to
27  configure their site and marketing materials so consumers would rely on their
28  representations.

91.    Each of the Individual Defendants did this with the knowledge and specific intent of aiding and abetting and facilitating Nerium's endless chaing pyramid scheme, Nerium had hoped and believed that by allowing Nerium to take credit card orders, more persons would be able to participate in the illegal pyramid, resulting in more revenue for themselves.  The Individual Defendants also realized that by providing their services to Nerium, this would lend an aura of respectability and further encourage participation.

92.    Each of the Individual Defendants had the specific intent to facilitate the wrongful conduct of Nerium.   The Individual Defendants had a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.

93.    The Individual Defendants each acted with specific intent of aiding and abetting and facilitating Nerium's illegal pyramid business practices.

94.    The similarity of the statements made by the Individual Defendants indicates a collusive effort to promote the Nerium scheme. The following paragraphs set forth just a small subset of publicly broadcast statements made by the Individual Defendants to promote the Nerium "business opportunity."

D.    **Plaintiffs Are Victims Of The Pyramid Scheme**

95.    Plaintiff Jia first became an Nerium Brand Partner on or about 2012 to 2013 by making purchases and buying the starter pack.  Plaintiff Jia continued to renew Nerium and pay monies toward the endless chain account years thereafter, and the endless chain account continues to be maintained and paid for.  Plaintiff Jia paid between $1200-$1500 towards the opportunity, which did not include out of pocket expenses for the opportunity.  Plaintiff Jia was deceived by Nerium's misleading opportunity believing, the opportunity was a legitimate way to earn money (even though that representation by Nerium and those representations made by the Individual Defendants were false), and Plaintiff Jia did in fact lose money as a result of Defendants' unfair, unlawful, and fraudulent business practice.

96.     Plaintiff Sarah Sormillon became a Nerium Brand Partner in 2016 by making purchases and buying the starter pack.  Plaintiff Sormillon paid approximately $600 towards the business opportunity, which did not include out of pocket expenses.

97.     Plaintiffs Jia and Sormillon were unable to make any retail sales, and they lost money in the Nerium scheme despite putting in effort.

98.     Nerium through itself and the Defendants, and Jia's upline actually made the representations (or in similar form) to Plaintiffs as reflected in ¶¶ 31, 35, 37, 38, 39-43, and 58 in written presentations, disclosures, online materials, online, orally, at various times for Jia in 2013, 2014, 2015, 2016 and as for Sormillon, 2016. Nerium also made income and other business representations to Sormillon, as reflected in exhibit A attached to this Complaint, and as to Jia, as reflected in exhibit B attached to this Complaint.  Representations (or ones similar thereto) were made by Plaintiffs to both Defendants, attached hereto as Exhibits A through D.

99.     Plaintiffs Jia and Sormillon were deceived by Nerium's misleading opportunity believing, the opportunity was a legitimate way to earn money (even though that representation by Nerium and the Individual Defendants was false), and Plaintiff Jia and Sormillon did in fact lose money as a result of Defendants' unfair, unlawful, and fraudulent business practices.

100.    The official policies in the Application and the Policies Manual (as later defined), and as conveyed through Plaintiff Jia's upline in the Nerium pyramid enterprise, discourage practices associated with pyramid schemes, such as inventory loading, and instead, have stated for several years to Jia, that the Defendants are a legitimate direct selling company.

101.    Plaintiff Jia discovered on or about March of 2017, that the Defendants were operating a pyramid scheme.

102.    That the Nerium opportunity was a pyramid scheme, was a fact concealed by the Defendants through their Application, their Policies Manual (as

later defined), through their training manuals, distribution materials, marketing materials, seminars, and the dissemination of presentation materials.

103.   Through March of 2017, the Defendants never intended to actually pay Jia or make her a success in the pyramid scheme of the Defendants, because Jia was not an insider or a conspirator in the pyramid scheme.

104.   Plaintiff Jia was ignorant of the fact that the Defendants were operating a pyramid scheme.  Plaintiff Jia relied on the fact that the Defendants had financial superiority, wealth, experience, and supposed acumen in the community, and particularly in consideration of Plaintiff's financial position.  Plaintiff had not discovered Nerium was operating a pyramid scheme until on or about March of 2017 when Plaintiff had learned about the various lawsuits against Nerium, and her efforts to sell or Nerium were exhausted.

100.   Plaintiff Jia lacked the ability to discover the facts that the Defendants were operating a pyramid scheme based on the Defendants' stature as a major company touting to be a billion dollar international company, and the promises of Nerium and Plaintiff's upline.

101.   From on or about 2012 to 2017, the Defendants engaged in a pattern of reasonably frequent and similar acts in not paying Plaintiff Jia any amount owed on account of their endless chain distributor account with Plaintiffs including points, credits, and charges, through 2017, all the time representing that the business was a legitimate direct selling company.

E.   **Nerium's Documents Of Adhesion**

105.   At some times during Nerium's history, it has apparently maintained a document labeled, "Independent Brand Partner Application" (the "Application").

106.   Upon recent investigation of the Application, it has been determined that the Application has at certain times, included a provision that provides as follows: "[a]ny and all disputes regarding or related to this Agreement, and all other documents incorporated herein, shall be resolved by binding arbitration administered

by the American Arbitration Association ("AAA") and conducted under its rules, and the arbitration proceeding shall be held in Dallas, Texas, as is more particularly set forth in Section 11.06 of the Nerium International Policies and Procedures Manual" ("Policies Manual").

107.   However, § 11.06 of the Policies Manual does not even discuss arbitration.

108.   Upon further investigation, § 11.09 of the Policies Manual provides:

a) Except as expressly set forth herein, all disputes, claims and controversies between Brand Partner and the Company relating to or arising out of the Agreement, the Compensation Plan, this Policy Manual, other documents produced by the Company, or the Company's products, the rights and obligations of Brand Partner and the Company or any other claims or causes of action relating to the performance of any Brand Partner under the Agreement and this Policy Manual shall be settled totally finally and exclusively by arbitration through the Company's Alternative Dispute Resolution Procedure ("ADR Procedure"). A copy of the Company's ADR Procedure has been delivered to Brand Partner and can be obtained from the Company by written request. No legal action can be filed in any court concerning a Dispute as defined in the ADR Procedure. The Disputes subject to arbitration include claims that Brand Partner's termination was illegal or unlawful.

b) Arbitration is commonly used and accepted technique for resolving Disputes in a timely, cost-efficient manner.  Any Brand Partner who feels that his or her termination was unlawful may file a claim and initiate the arbitration process directly, or through an attorney, within six months of the termination decision.

c) Notwithstanding the foregoing, the arbitrator shall have no jurisdiction over disputes relating to the ownership, validity or registration of any mark or other intellectual property or proprietary or confidential information of the Company without the Company's prior written consent. The Company may seek any applicable remedy in any applicable forum with respect to these disputes and with respect to money owing to the Company. In addition to monetary damages, the Company may obtain injunctive relief

against Brand Partner for any violation of the Agreement or misuse of the Company's trademark, copyright or confidential information policies.

d) Nothing in this rule shall prevent the Company from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to safeguard and protect the Company's interests prior to the filing of or during or following any arbitration or other proceeding or pending the handing down of a decision or award in connection with any arbitration or other proceeding.

e) Nothing contained herein shall be deemed to give the arbitrator any authority, power or right to alter, change, amend, modify, add to, or to subtract from any of the provisions of this Agreement.

(Policies Manual, § 11.09).

109.   According to Nerium, a person becomes a brand partner Nerium when he or she buys a "starter pack."

110.   As for Plaintiff Sormillon, like other class members who signed up online, Sormillon did not have to sign or agree to the Application, nor Policies Manual prior to purchasing a starter pack to become a Brand Partner.  (See Figure No. 1).

FIGURE NO. 1



111.   Several screens prior to Figure No. 1, the screen on Nerium's website provides "I agree to Nerium International Terms of Service" next to a check box so that an individual could sign up for an "Edge Subscription."  (*See* Figure No. 2 below).

FIGURE NO. 2



112.   However, "Terms of Service" is not one of the documents on the Nerium site, nor any document presented to Sormillon and/or other class members online.

113.   The arbitration policy of Nerium is unenforceable and unconscionable for several reasons based on law and fact.

114.   Plaintiffs' and the Class Members' participation in Nerium's endless chain is embodied through invoices, receipts, and open account statements (among other documents).

## VI.   CLASS ACTION ALLEGATIONS

115.   Plaintiffs seek to represent a nationwide class defined as follows:

116.   Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23.

117.   Plaintiffs seek to certify a class pursuant to Fed. R. Civ. Proc. 23(a), 23(b), 23(c)(4), and 23(c)(5), if necessary.

118.   Plaintiffs seek relief on behalf of themselves and the following class: persons who paid start-up fees, monthly fees, annual fees, seminar ticket fees, any other fees imposed by Nerium, and/or purchased products from Nerium between January 1, 2012, to the present date, whose gross amounts paid to Nerium exceeded income received from their participation in the Nerium scheme.

119.   Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, Plaintiffs also seek to represent a sub-class

1   in California, defined as follows: persons residing in California who paid start-up

2   fees, monthly fees, annual fees, seminar ticket fees, any other fees imposed by

3   Nerium, and/or purchased products from Nerium between January 1, 2012, to the

4   present date, whose gross amounts paid to Nerium exceeded income received from

5   their participation in the Nerium scheme.

6          120.   Subject to confirmation, clarification and/or modification based on

7   discovery to be conducted in this action, Plaintiffs also seeks to represent a sub-class

8   of all worldwide participants of Nerium, defined as follows: persons residing

9   anywhere in the World who paid start-up fees, monthly fees, annual fees, seminar

10  ticket fees, any other fees imposed by Nerium, and/or purchased products from

11  Nerium between January 1, 2012, to the present date, whose gross amounts paid to

12  Nerium exceeded income received from their participation in the Nerium scheme.

13         121.   Pursuant to the previous paragraph of this complaint, the damage to any

14  person living anywhere else other than the United States involved a domestic injury

15  to business or property because all contracts of independent business owners were

16  negotiated, executed, and stored on a server in the United States owned by Nerium,

17  and are available on the worldwide web, involved a significant connection to

18  domestic commerce in that the labeling, products, and other parts of the

19  manufacturing and sales and marketing process were conducted from the United

20  States, and for other reasons to be provided according to proof, and after the

21  opportunity for discovery.

22         122.   Excluded from the class are the Defendants, executives of Nerium,

23  family members, this Court.

24         101.   Plaintiffs seek to pursue a private attorney general action for injunctive

25  relief for themselves and all members of the class, and they satisfy the standing and

26  class action requirements.

27         102.   While the exact number of members in the Class and Subclasses are

28  unknown to Plaintiffs at this time, and can only be determined by appropriate

discovery, membership in the class and subclasses is ascertainable based upon the records maintained by Defendant.  It is estimated that the members of the Class are greater than 100,000, nationwide.

103.   Therefore, the Class and Subclasses are so numerous that individual joinder of all Class and Subclass members is impracticable.

104.   There are questions of law and/or fact common to the class and subclasses, including but not limited to: (a) Whether Nerium is operating an endless chain; (b) Whether Distributors paid money to Nerium for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers; (c) Whether Nerium's rules apply to Section 327 claims; (d) If the Nerium rules do apply, are Nerium's rules effective; (e) If the Nerium rules do apply, and Nerium's rules are effective, did Nerium enforce those rules; (f) Whether Nerium or the Individual Defendants omitted to inform the Plaintiffs and the plaintiff class that they were entering into an illegal scheme where an overwhelming number of participants lose money; (g) Whether Nerium's statements of compensation during the Class Period were deceptive and misleading; (h) Whether Nerium's conduct constitutes an unlawful, unfair and/or deceptive trade practice under California state law; (i) Whether Nerium's conduct constitutes unfair competition under California state law; and (j) Whether Nerium's conduct constitutes false advertising under California state law.

105.   These and other questions of law and/or fact are common to the class and subclasses and predominate over any question affecting only individual class members.

106.   Plaintiffs' claims are typical of the claims of the class and subclasses in that Plaintiffs were Brand Partners for Defendant Nerium and lost money because of the illegal scheme.

107.   Plaintiffs will fairly and adequately represent the interests of the class and subclasses. Plaintiffs' claims are typical of those of the class and subclasses.

Plaintiffs' interests are fully aligned with those of the class and subclasses. Plaintiffs have retained counsel experienced and skilled in complex class action litigation.

108.   Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged, because such treatment will allow many similarly-situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

109.   Plaintiffs know of no difficulty likely to be encountered in the management that would preclude its maintenance as a class action.

VII.   **CLASS ACTION COUNTS**

## COUNT I

**Declaratory Judgment Declaring the Arbitration Provision Unenforceable**

(Plaintiffs on Behalf of Themselves And Those Similarly Situated, Against All Defendants, including DOES 1 through 10)

110.   Plaintiffs reallege all allegations as if fully set forth herein, and incorporate previous allegations by reference.

111.   Neither Plaintiff assented to an arbitration policy of Nerium in becoming a Brand Partner.

112.   In the alternative, the arbitration policy of Nerium is unconscionable.

113.   The arbitration provision is alternatively, unenforceable as a matter of fact, and law.

114.   For these reasons, and those legal reasons to be stated in connection with any motion practice initiated by the Defendants, the Court should declare that the arbitration provision is illusory, lacks consideration, is unenforceable, and that the Plaintiffs' claims and the Classes' claims are properly before this Court.

## COUNT II

**ENDLESS CHAIN SCHEME; California Penal Code § 327 and Section 1689.2 of the California Civil Code**

1     (Plaintiffs on behalf of themselves and the Class, Against All Defendants including

2                              DOES 1 through 10)

3         97.    Plaintiffs reallege all allegations as if fully set forth herein, and

4   incorporate previous allegations by reference.

5         98.    Section 1689.2 of the California Civil Code provides: "[a] participant in

6   an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind

7   the contract upon which the scheme is based, and may recover all consideration paid

8   pursuant to the scheme, less any amounts paid or consideration provided to the

9   participant pursuant to the scheme."

10        99.    The Defendants are operating an endless chain scheme under Section

11  327 of the Penal Code because they have contrived, prepared, set up, and proposed

12  an endless chain as pled in the factual section of this Complaint.

13        100.   The Nerium operation constitute a scheme for the disposal or

14  distribution of property whereby class members pay a valuable consideration for the

15  chance to receive compensation for introducing one or more additional persons into

16  participation in the scheme or for the chance to receive compensation when a person

17  introduced by the participant introduces a new participant.

18        101.   Independently, the Nerium operation constitute an endless chain

19  because members pay an initial fee and then are required to purchase significant

20  amounts of product, only to have a membership terminated (and points/commissions

21  canceled), if he fails to pay.

22        102.   Independently, the Nerium operations constitute an endless chain

23  because defendants tell victims they earn commissions by recruiting other people to

24  buy memberships and the members, were in turn, instructed to recruit more

25  members.  Revenues are made primarily from recruitments.

26        103.   Independently, the Nerium operations constitute an endless chain

27  because Defendants' commissions, income, lottery gifts like vehicles, and free

28

1  products were based on a current member's sales of memberships to new members

2  and not the sale of products.

3        104.   Plaintiffs and the class have suffered an injury in fact and have lost

4  money or property because of Nerium and the Individual Defendants' operation of

5  an endless chain, business acts, omissions, and practices.

6        105.   Plaintiffs and the class are entitled to: (a) rescind all receipts,

7  statements, invoices, and writings upon which the scheme is based and recover all

8  consideration paid under the scheme, less any amounts paid or consideration

9  provided to the participant under the scheme; (b) restitution, compensatory and

10  consequential damages (where not inconsistent with their request for rescission or

11  restitution); and (c) attorneys' fees, costs, pre and post-judgment interest.

12                              **COUNT III**

13  **Unfair and Deceptive Practices Claims Under Cal. Bus, & Prof. Code § 17200,**

14                                *et seq.*

15  (Plaintiffs on behalf of themselves and the Class Against All Defendants including

16                       DOES 1 through 10)

17        106.   Plaintiffs reallege all allegations as if fully set forth herein, and

18  incorporate previous allegations by reference.

19        107.   All claims brought under this Third Cause of action that refer or relate

20  to the unlawful, fraudulent or unfair "endless chain" of the Defendants are brought

21  on behalf of Plaintiffs and the Class.

22        108.   All claims brought under this Third Cause of Action that refer or relate

23  to the unlawful, fraudulent or unfair the statements, the touted Nerium "business

24  opportunity" are brought on behalf of Plaintiffs and the Class.

25        109.    Nerium has engaged in constant and continuous unlawful, fraudulent

26  and unfair business acts or practices, and unfair, deceptive, false and misleading

27  advertising within the meaning of the California Business and Professions Code §

28  17200, *et seq*. The acts or practices alleged constitute a pattern of behavior, pursued

1   as a wrongful business practice that has victimized and continues to victimize

2   thousands of consumers for which Plaintiffs' seek to enjoin from further operation.

3   The Nerium Sales and Marketing Plan Is Unlawful.

4        110.   Under California Business and Professions Code § 17200, an

5   "unlawful" business practice is one that violates California law.

6        111.   Nerium's business practices are unlawful under § 17200 because they

7   constitute an illegal "endless chain" as defined under, and prohibited by, California

8   Penal Code § 327.

9        112.   Nerium utilizes its illegal "endless chain" with the intent, directly or

10   indirectly, to dispose of property in Nerium's products and to convince Distributors

11   to recruit others to do the same.

12        113.   Nerium's business practices are unlawful pursuant to §17200 because

13   they violate §17500 *et seq.*, as alleged in the Fourth Count.

14        114.   Under California Business and Professions Code § 17200, a

15   "fraudulent" business practice is one that is likely to deceive the public.

16        115.   Nerium's business practices are fraudulent in two separately actionable

17   ways: (1) Nerium's business constitutes an illegal and deceptive "endless chain;" (2)

18   the touted, yet non-existent, Nerium "business opportunity" is for everyone,

19   including but not limited to Nerium's massive advertising campaign and the

20   misleading statements of compensation.

21        116.   First, as detailed herein, Defendants promoted participation in the

22   Nerium endless chain, which has a compensation program based on payments to

23   participants for the purchase of product by participants, not the retail sale of

24   products or services.

25        117.   Nerium has made numerous misleading representations to Plaintiffs

26   about the business opportunity of Nerium and the income that a recruit or a

27   distributor can realize by becoming a distributor, and participating in the scheme.

28

118.   Nerium knew, or should have known, that the representations about the business opportunity of Nerium were misleading in nature.

119.   As a direct result of Nerium' fraudulent representations and omissions regarding the Nerium endless chain described herein, Nerium wrongly acquired money from Plaintiff and the members of the classes.

120.   Second, Nerium touted, in numerous different ways as part of a massive advertising campaign, a "business opportunity," which Nerium also repeatedly and in many ways represented, among other things, as being "for everyone" and allowing "full time" or "part time" opportunities.

121.   The massive advertising campaign included among other things, the website, emails, websites, presentations by Nerium, training, word of mouth among Distributors, and events.

122.   As part of this campaign and a further inducement to potential Distributors, Nerium made and disseminated statements of compensation that further misled the public, among other things: (1) by using cryptic and technical terms known to Nerium but not to the general public or to those exploring the claimed "business opportunity," (2) by highlighting the successful persons, i.e., those that received compensation from Nerium, and the average gross compensation paid by Nerium to those persons, (3) by failing to disclose the actual number of successful persons as compared to the number of Distributors who received no compensation from Nerium, and (4) by downplaying and omitting the risks and costs involved in starting an Nerium Distributorship and succeeding in such a Distributorship.

123.   In reality, the touted "business opportunity" was only for a select few, and those that were recruited specially.  And these numbers did not include expenses incurred by distributors in the operation or promotion of their businesses, meaning there were likely more net losers who made no profit at all.

124.   Nerium knew, or should have known, that the selective information presented to distributors in the compensation and its massive adverting campaign during that time frame touting its purported "business opportunity" was likely to mislead the public and did in fact mislead the public into believing that there was a legitimate "business opportunity" in which Distributors/Brand Partners, or a large portion of them, could make money in either a full or part time capacity. In fact, however, there was no such "business opportunity," except for a very select few.

125.   As a direct result of Nerium' fraudulent representations and omissions regarding the Statement and the massive adverting campaign during that time frame and thereafter touting Nerium's purported "business opportunity" described herein, Nerium wrongly acquired money from Plaintiffs and the members of the classes.

126.   The named Plaintiffs have standing to bring these § 17200 claims under the fraudulent prong, and can demonstrate actual reliance on the alleged fraudulent conduct.

127.   For instance, Plaintiffs have been in receipt of misleading and false financial statements and marketing materials/seminar papers, which promoted the Nerium scheme and claimed "business opportunity" and contained material false representations regarding the success Distributors could achieve through Nerium by purchasing products and recruiting others to do the same.

128.   There were other representations made to Brand Partners as part of the massive advertising campaign regarding the claimed "business opportunity," on which Plaintiff or some of the Class Members, reasonably believed the representations they could succeed in the "business opportunity," did not return the refund, purchased Nerium products and did not immediately return them, signed up as Nerium Brand Partners, and attempted to and recruited others to do the same. These other representations include, but are not limited to the following: (a) emails from Nerium that promoted Nerium and contained material false representations regarding the success that a distributor could achieve through Nerium by purchasing

1  products and recruiting others to do the same; (b) websites, such as

2  www.nerium.com and Neriumskin.com, which promoted the fraudulent scheme

3  through videos of Individual Defendants containing material false representations

4  regarding the "business opportunity" available to Distributors and the wealth that a

5  distributor could get by agreeing to become an Nerium distributor; (c) presentations

6  by Nerium Distributors which contained material false representations regarding the

7  "business opportunity" and the success that a distributor could get through Nerium

8  by purchasing products and recruiting others to do the same; (d) presentations by

9  Nerium, including the presentations described in this complaint, which contained

10  material false representations regarding the "business opportunity" and the success

11  that a distributor could get through Nerium by purchasing products and recruiting

12  others to do the same; (e) training and events where Nerium Brand Partners made

13  material false representations regarding the "business opportunity" and the success

14  that a distributor could get through Nerium by purchasing products and recruiting

15  others to do the same.

16      129.   To the extent proof of reliance is required of Plaintiffs, Nerium and the

17  Individual Defendants knew that Plaintiffs and the class would reasonably rely on

18  their representations and omissions, which would cause the Plaintiffs and the class

19  joining the fraudulent endless chain scheme and purchasing the products, and

20  Plaintiffs did in fact reasonably rely upon such representations and omissions.

21      130.   Indeed, had Plaintiffs and the class known that Nerium and its

22  Individual Defendants were promoting an endless chain, they would not have

23  become Nerium Brand Partners in the first place and, if learned after becoming a

24  distributor, they would not have purchased Nerium products thereafter.

25      131.   Had Plaintiffs and the class known that Nerium was promoting a

26  "business opportunity" that did not exist except for a select few, they would not

27  have become Nerium Distributors in the first place and, if learned after becoming a

28  distributor, they would not have purchased Nerium products thereafter.

132.   Finally, the fraudulent acts, representations and omissions described herein were material not only to Plaintiffs and the class (as described in this complaint), but also to reasonable persons.

133.   Under California Business and Professions Code § 17200, a business practice is "unfair" if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury which outweighs its benefits.

134.   For the reasons set forth herein and above, Nerium's promotion and operation of an unlawful and fraudulent endless chain, and its fraudulent representations and omissions regarding its purported "business opportunity," are also unethical, oppressive, and unscrupulous in that Nerium is and has been duping Plaintiff and the class out of billions, or at least hundreds of millions, of dollars.

135.   Nerium's actions have few, if any, benefits. Thus, the injury caused to Plaintiff and the class easily and dramatically outweigh the benefits, if any.

136.   Defendants should be made to disgorge all ill-gotten gains and return to Plaintiff and the class all wrongfully taken amounts.

137.   Finally, Defendants' unlawful, fraudulent and unfair acts and omissions will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203, Plaintiffs and the class seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, fraudulent and unfair, and enjoining them from further undertaking any of the unlawful, fraudulent and unfair acts or omissions described herein.

## COUNT IV

**False Advertising - California Business and Professions Code § 17500, et seq.**

(Plaintiffs on behalf of themselves and the Class Against All Defendants including DOES 1 through 10)

138.   Plaintiffs reallege all allegations as if fully set forth herein, and incorporate previous allegations by reference.

139.   All claims brought under this Fourth Count that refer or relate to the false, untrue, fraudulent or misleading endless chain of Defendants are brought on behalf of Plaintiffs and the Class.

140.   All claims brought under this Fourth Count that refer or relate to the false, untrue, fraudulent or misleading statements of income are brought on behalf of Plaintiffs.

141.   All claims brought under this Fourth Count that refer or relate to the false, untrue, fraudulent or misleading statements of income are brought on behalf of Plaintiffs and the Class.

142.   Defendants' business acts, false advertisements and materially misleading omissions constitute false advertising, in violation of the California Business and Professions Code § 17500, *et seq*.

143.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions regarding the purported "business opportunity," and the "health benefits" likely to deceive the public and include, but are not limited to, the items set forth in the factual background of this Complaint. Nerium knew, or should have known, that the representations about the business opportunity of Nerium were misleading in nature.

144.   Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiff and the class members to which they were not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiff and all other Nerium Distributors in the class who signed an agreement with Nerium governed by California law their profits and compensation and/or make restitution to Plaintiff and the Class.

145.   Under California Business and Professions Code Section 17535, Plaintiffs and the class seek a judicial order directing Defendants to cease and desist

all false advertising related to the Defendants' illegal endless chain scheme, and such other injunctive relief as the Court finds just and appropriate.

146.   Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiff and the class members to which they were not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiff and all other Nerium Distributors in the class who signed a Distributor Agreement with Nerium their profits and compensation and/or make restitution to Plaintiff and the class.

147.   Under California Business and Professions Code Section 17535, Plaintiff and the class seek a judicial order directing Defendants to cease and desist from all false advertising related to the Defendants' illegal scheme, and such other injunctive relief as the Court finds just and appropriate.

## COUNT V
### (RICO 18 U.S.C. § 1961(5), 1962(c))

(Plaintiffs on behalf of themselves and the Class Against All Defendants including DOES 1 through 10)

148.   Plaintiffs reallege all allegations as if fully set forth herein, and incorporate previous allegations by reference.

149.   RICO prohibits the following conduct: It shall be unlawful for (1) any person (2) employed by or associated with (3) any enterprise (4) engaged in, or the activities of which affect, interstate or foreign commerce, (5) to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs (6) through a pattern of racketeering activity or collection of unlawful debt. 18. U.S.C. § 1961.

150.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

151.   RICO requires that a "person" violate its provisions." 18 U.S.C. § 1962(c-d). A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO person can be either an individual or a corporate entity. All Defendants named in this count are RICO persons.

152.   Defendants Jeff, Renee, Amber, Shouhed, Hefernan have acted as an "association-in-fact" for a common purpose, have and maintained relationships between and among each other (and nonparties), and the association-in-fact has a longevity sufficient to permit those associates to pursue the enterprise's purpose the establishment and perpetuation of an unlawful pyramid scheme in which hundreds of thousands of people have lost money. The operation and management of the association in fact was generally led, at various times, by Defendants Jeff, Renee, and Amber. The individual promoter defendants Shouhed and Hefernan generally operated certain field aspects of the enterprise, taking direction from Jeff, Renee, and Amber. Jeff, Renee, and Amber provided funds to enable the association to grow and management and strategic advice to grow and expand the pyramid scheme. Later, Jeff, Renee, and Amber provided financial incentives to certain recruiters.

153.   The "association-in-fact" began in 2011 and has continued to today. Each of the Defendants charged in Count V has been a part of the association-in fact as follows: Jeff: 2011-present; Renee: 2012-present; Amber: 2012-present; Shouhed: 2012-present; Hefernan: 2012-present.

**A. Nerium and The Individual Defendants Make False Claims As To The Nerium Opportunity**

154.   In 2011 Jeff formed Nerium, and shortly thereafter, named his wife Renee, and his daughter Amber, as key top executives of the company.

155.   Nerium broadcasts that you can receive a "live better bonus of $150,000."

156.   "With Nerium International, you can have everything."  Further, "[o]ur program allows you the life-changing career to tailor your career to unlimited success, your way...  They incentivize you to become the best person you can be...  I quickly earned my Lexus...  I got an i-pad bonus.. You can pay off your student loans…  I wanted to retire my parents."

157.   You "get paid to party." The representation "[i]f you want your future on your terms, get with your referring brand partner for more information."

158.   CEO Jeff Olson claims, "We have people who've earned their iPads, they've earned their cars, earned dream vacations, great incomes, six figure incomes, people making adult incomes, people making incomes that put them in the top 5 percentile of the United States."

159.   While Nerium's website professes that it provides its distributors with financial freedom, its outdated, hard-to-find, U.S. 2013 Income Declaration is misleading affirmatively, and by omission.

160.   Nerium represents: "I wanted to be able to get out there and retire my parents. I wanted to be able to go out there and make an impact in their life, and Nerium gave me that opportunity."

161.   Nerium further represents: "[w]hen you don't worry about money anymore, you don't have to stress out over the bills, you know it's about the choices you have – the freedom you have."

162.   "Nerium has just completely changed my life; everything about my life has gotten completely 100% better. We recently purchased our dream home and it's absolutely gorgeous."

163.   Each of the statements made by Nerium in the preceding  eight were false and misleading.

B.   **Rico Enterprise**

164.   A defendant can be both a RICO "person" and part of another RICO "enterprise." Plaintiffs and the class allege the following:

1       (a) each Defendant is a RICO "person."

2       (b) each individual defendant, i.e., each person, combination of

3            persons or combination one or more person and an entity as defined

4            above, is a RICO "person."

5       (c) the Defendants named in this Count are an "enterprise," (e.g., a de

6            facto corporation acting as a single legal entity, or, alternatively, an

7            association in fact).

8      165.   There was an identifiable hierarchy and framework within the

9  enterprise.  It is directed by Jeff, Renee, and Amber, to whom the remaining

10  Defendants named in this Count report.

11      C.    **All Defendants Are "Employed By Or Associated With" The Rico**

12            **"Enterprise"**

13      166.   Under Section 1962(c), a defendant must be "employed by or

14  associated with" the RICO enterprise.  Section 1962(c) operates equally to both

15  "insiders" and "outsiders" who participate directly or indirectly in the conduct of the

16  enterprise's affairs through a pattern of racketeering activity. All Defendants named

17  in this Count are employed by or associated with the enterprise, as set forth in detail

18  previously.

19      167.   They conduct and participate in the operation or management of the

20  pyramid scheme through a pattern of racketeering activity, by conducting the affairs

21  and supporting the acts of the pyramid scheme.  Jeff, Renee, and Amber use the

22  assets of Nerium to direct, in whole or part, the affairs of the pyramid scheme,

23  including the operation of the pyramid scheme and the distribution of unlawful

24  profits to individuals associated with the scheme.  Jeff, Renee, and Amber control

25  and direct the websites, web presentations, events, sponsored conventions and

26  speeches of each of them, and the dissemination of video of same, and the individual

27  promoter Defendants named in this Count.  Shouhed and Hefernan joined this part

28

of the operation in approximately 2013.  They then have an ascertainable structure separate and apart from the pattern of racketeering activity.

168.   Olson has directed the Company to disburse over time more than $3.5 million in Company funds to an entity called FARC, LLC. In the spring of 2015, Nerium's CFO, Lori Jones, discovered a collection of these mysterious payments (in $15k and $150k increments) scattered and buried in a Company ledger of over 100,000 entries.

169.   After this discovery, Lori Jones and Joe Nester asked Jeff Branch (the Company's Chief Financial Officer) to explain who FARC was and what services or goods it was providing to the Company. Mr. Branch stated that the expenditures were not something Nerium should concern itself with. He directed further inquiry to the Company's General Counsel, Eric Haynes. When asked the same question, Mr. Haynes responded that FARC was engaged for "business development purposes," and refused to explain more. In fact, Olson bound the Company to a secret agreement with his long-time friend Steve Bright, to transfer enormous wealth from the Company to Bright, through FARC.  FARC was created on August 26, 2011 for the apparent purpose of receiving these payments.  That same day, Bright's wife Vicki entered into the agreement whereby Olson purportedly (1) transferred 3% ownership in the Company to FARC; (2) agreed to pay FARC 5% of the revenues Olson received from the sale of promotional items or sales tools under the Company Agreement; and (3) agreed to retroactively place a phony sales distributorship at the top of the Company's sales pyramid, whereby FARC would be paid commissions as one of the top earning sales distributors without actually performing services as a sales distributor for the Company. In exchange for these lucrative promises of Company cash, FARC tendered just "ten dollars and other good and valuable consideration."

170.   The other promoters are also "employed by or associated with" each other and the remaining Defendants for purposes of RICO.  They conduct and participate in the operation or management of the pyramid scheme through a pattern

1  of racketeering activity, by conducting the affairs and supporting the acts of the

2  pyramid scheme.  They receive payments and benefits for operating at or near the

3  top of the "downline" pyramid, engage in wholesale recruiting at the direction of

4  Nerium.  Jeff, Renee, Amber, communicate regularly with Nerium, regarding

5  personal appearances at recruiting conventions, operate websites that induce

6  innocent people to engage in the illegal pyramid, and cooperate with the other

7  Defendants to lend their names to promotional materials, make false statements, and

8  in some instances, appear in the internet reality series.  While appearing as

9  ostensible "independent" distributors for purposes of convincing innocent recruits to

10  join the "business opportunity," each of them takes direction from and is in contact

11  with each other and Jeff Renee, and Amber.

       D.     **All RICO Persons Are Distinct From The RICO Enterprise**

12

13     171.   RICO requires the involvement of a RICO "enterprise." 18 U.S.C. §

14  1964 (a-d).  An "enterprise" includes any individual, partnership, corporation,

15  association, or other legal entity, and any union or group of individuals associated in

16  fact although not a legal entity."  18 U.S.C. § 1961(5).

17     172.   The enterprise itself is not the liable entity, rather it is the RICO person

18  who conducts the affairs of the enterprise through a pattern of racketeering activity.

19  Nerium and the individual Defendants described in this complaint are distinct from

20  each other. The individual Defendants are distinct from the corporate defendant. The

21  corporate Defendant is distinct from the RICO enterprise because it is functionally

22  separate, performs different roles within the enterprise and uses its separate legal

23  incorporation to facilitate racketeering activity. For example, Nerium operates

24  legally in part by selling its products to consumers without operating as a pyramid

25  scheme.

26     173.   Besides paying the salaries of Amber and Renee, Jeff and Nerium also

27  created phony distributorship positions for them, placing them at the top of the

28  pyramid of brand partners where they could receive monthly "commission" checks

as leading distributors – without actually distributing anything.  To hide these payments, phantom distributor names were entered into the Nerium accounting system – for Amber, the distributorship was called "Gator Marketing," for Renee, the distributorship was called "Chill Development."  Secret payments to Gator Marketing exceeded $1,000,000 per year and payments to Chill Development exceeded $700,000 per year.  Renee also received a payment of $347,000 which was booked as a bridge loan for "Stone & Bruce."

E.     **The Defendants Engaged In Activities Which Affect Interstate Commerce**

174.   Each of the Defendants named in this Count engaged in, and/or each others' activities affect, interstate or foreign commerce. The pyramid scheme has operated in the United States, and originated domestic business contracts with people living in Japan, Columbia, and Hong Kong.  Most recently Nerium is marketing and creating domestic business opportunities for those residing in Australia.

F.     **The Defendants Participated In The Conduct of the Enterprise's Affairs**

175.   Each of the Defendants named in this Count conducted, or participated directly or indirectly, in the conduct of such enterprise's affairs as set forth above.

G.     **The Defendants Engaged In A "Pattern of Racketeering Activity" Over An Extended Period of Time With A Threat of Repetition Into The Future**

176.    RICO requires a "pattern of racketeering activity."  A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense (an act "indictable under any of" certain provisions of" 18. U.S.C. § 1961(1)(D)).  *See* 18 U.S.C. § 1961(5). A "pattern of racketeering activity" can be a past conduct that by its nature projects into the future with a threat of repetition.  It can also be conduct over a closed period

through a series of related predicates extending over a substantial period.  Both of these apply here.

177.   The Defendants' pattern of racketeering activity is well-established and has continued from 2011 to the present and intends to continue into the future.  The Defendants have taken every imaginable step to sell the pyramid program to Business Partners and potential Business Partners.  They each also expect to continue to receive income from the pyramid scheme.  With each new person recruited, the Defendants increase the value of their control of the pyramid scheme.  The Defendants have stated their intentions to continue to grow the pyramid throughout the United States, and have expanded.  They have announced an intention to market to other persons in 2017.  It is certain that their conduct is a continuing threat due to their racketeering activities.

## H.   Defendants Have Used And Caused To Be Used Fraudulent Mail and Wire Communications In Interstate Commerce, 18 U.S.C. § 1341 AND 18 U.S.C. § 1343

178.   Mail and wire fraud are enumerated predicate acts that can constitute RICO "racketeering activity" under Section 1961(1)(D).

179.   Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it. 18 U.S.C. § 1341.

180.   The Defendants named in this Count have transmitted, caused to be transmitted or invited others to transmit marketing material and income disclosure materials, by mail or private or commercial carriers, such as UPS, for the purpose of executing their scheme or artifice to defraud in violation of RICO.  Likewise, they have distributed promotional literature, statements, checks, and other mailings all between 2011 and the present by mail.  Without limitation, each statement sent monthly to an Brand Partner distributor is a mailing and an act of mail fraud, and each promotional literature sent by U.S. Mail is a mailing and an act of mail fraud.

181.   Wire fraud occurs when an individual devises a plot to defraud and subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343. The defendants have used the Internet since 2011 to disseminate, publish and spread the pyramid scheme throughout the United States and to Hong Kong, Japan and Columbia for the purpose of executing their scheme or artifice to defraud in violation of RICO. Thus, the Defendants have transmitted, caused to be transmitted and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing their scheme or artifice to defraud in violation of 18 U.S.C. §1343.

182.   Without limitation, for example, each transmission of a video to be posted on YouTube, Vimeo, Facebook, Wechat, Google, Pinterest, Instagram, Linkedin, or through Twitter, or establishment of a website to disseminate information about the pyramid scheme or transmission of signals, pictures or information to such website is a separate act of wire fraud.

183.   Defendants committed at least two predicate acts of mail and/or wire fraud relevant to this Count.  These, along with factual allegations against other Defendants, are described throughout this Complaint.

184.   Each of the Defendants named in this Count acted with requisite intent to establish, perpetuate and/or carry out the pyramid scheme to defraud.  Each Defendant named in this Count acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information mailed or wired in furtherance of the pyramid scheme as to constitute requisite scienter to commit mail and wire fraud.

185.   Nerium represents you can earn "$10,000 per month just for having fun."

186.   That scienter can be inferred from, among other things at least the following:  (a) Various third parties and business partners of Nerium have asserted publicly and in litigation, that Nerium is a pyramid scheme during its short history,

(b) many consumers have complained to the FTC that Nerium constitutes an illegal pyramid scheme (c) promoters and marketers of Nerium, including Batchelorette star Michael Turnbull have stated in a "Current Affair" television show aired in Australia in 2016: "I certainly wouldn't intentionally get into a pyramid scheme if that's what this business [Nerium] is." (d) Defendant Jeff was directly involved in the financing and active management of the Nerium company  and  individually knew  and/or recklessly disregarded that that the operation of that entity was an illegal pyramid scheme; (e) Jeff Olson is a veteran of the network marketing industry and was involved in multiple allegations of their companies operating as a pyramid scheme; (f) There  is  a network industry awareness that the FTC has closed down similar operations for being an illegal pyramid (for example BurnLounge, Vemma, Equinox and others) and (g) an awareness on the part of each of these Defendants that recruiting others into a particular sales scheme has been deemed by the FTC and courts to be an illegal pyramid scheme.

187.   A number of the Individual Promoter Defendants are also in the separate business of assisting new recruits on how to themselves recruit others. Some of the individual Promotor Defendants use fake testimonials to market the products of Nerium.  These Defendants therefore have for years had an opportunity to understand that their participation in the Nerium scheme is an illegal pyramid and/or recklessly disregarded the notion and consciously participated in an illegal pyramid scheme.

**I.      The Defendants' Promotion of the Pyramid Is A Per Se Scheme To Defraud Under The Mail And Wire Fraud Statutes**

188.   The Defendants named in this Count have used a false and fraudulent scheme, or a scheme to defraud within the meaning of federal law, to harm Plaintiffs and the class.  In all respects, these Defendants have conducted their affairs unlawfully, intentionally, willfully and with intent to defraud, that is, knowingly and with such specific intent to deceive as is in violation of the mail and wire fraud

statutes. They have done so in order to cause financial gain for themselves and for others, all to the detriment of Plaintiffs and the class.

189.   First, each Defendant named in this Count has promoted the pyramid scheme that, by its very nature, is a per se scheme and artifice to defraud to obtain money by false pretenses.  As detailed in this complaint, all Defendants named in this Count have promoted and successfully expanded the pyramid scheme to victimize the named Plaintiffs and the class. Each of the enumerated acts of wire and mail fraud in furtherance of the pyramid scheme is an act of racketeering. Second, as part of the pyramid scheme, the Defendants named in this Count made numerous false statements in furtherance of the scheme.

190.   Examples of the falsity of these statements include: (a) creating and disseminating the false impression that through the pyramid scheme, Business Partners like Plaintiffs and the class can get "free" Lexus', and/or can get a sizeable monthly or "residual" income; (b) creating and disseminating the false impression that the Business Partners program has enormous or unlimited income potential and that the Business Partners can make enormous money as a result of participating as a promoter for the program; (c) creating and disseminating the false impression that the Business Partners' is an opportunity that one can make money while partying.

191.   Further, the Defendants created and disseminated the false impression that there are many available persons who will want to purchase the age-defying products and that the purchase of a Business Partner enrollment will enable the purchaser to make money from legitimate sales. In reality, the defendants know that sales of the age-defying products are made almost exclusively to people who are promoters.

192.   Further, the Defendants created and disseminated the false impression that the success stories featured by Nerium are typical or, in some cases, even possible when defendants knew that the persons portrayed were falsely portrayed, persons portrayed were being paid (unreal) amounts of money for committing an

1  illegal activity and/or were assisted by the defendants in setting up a sufficiently

2  large "downline" that the income generated was in fact large.

3       193.   Third, as part of the pyramid scheme the Defendants named in this

4  Count omitted material facts for the purpose of and with the intention of the

5  fraudulent pyramid scheme by obtaining money from the victims.  Examples of

6  these omissions include: (a) failure to reveal that the multilevel marketing program

7  and its Business Partner program are illegal pyramid schemes but instead propagate

8  the statements and impression that it is a legal enterprise; (b) failure to reveal that

9  under compensation plan that the majority of the Brand Partners have and likely will

10 lose their money; (c) failure to disclose that many of the top Brand Partners earners

11 paraded by the company (at company-sponsored spectacles and through other

12 publicly disseminated events, videos, documents, and other media) as examples of

13 what Brand Partners can  hope  to  attain  through  following  the  Nerium

14 compensation plan were in fact already well established salespeople for other

15 network companies who were recruited to bring large, preexisting  "downlines" by

16 the company and were placed in their positions, aided in their attainment of their

17 Nerium ranks, and/or otherwise compensated beyond what is  paid to ordinary

18 Brand Partners under the Compensation Plan; (d) failure to reveal  that the company

19 knowingly spread unreal and misleading accounts and claims of the success of its

20 upper level executives, all in an effort to attract new Brand Partners, but avoid

21 disclosing a direct connection between the statements and Nerium.

22      J.     **Plaintiffs and the Classes Have Proximately Suffered RICO Injury**

23            **To Business**

24      194.   A "violation" of RICO is committed if "individuals and entities," use

25 the mails or interstate wire facilities in the execution of "any scheme to defraud." 18

26 U.S.C. §§ 1341, 1343, Sections 1961(1) (B), 1962.  Sections 1964 (a), (c) and (d)

27 authorize persons "injured" in their "business or property," "by reason of" RICO's

28

"violation" to sue for appropriate redress, including equity relief, treble damages and attorneys' fees.

195.   Each of the Plaintiffs (and the class sought to be certified) suffered a loss of money composed of the cost they paid to become an IP, together with the website fees, administrative fees, and the cost of merchandise purchased as samples and for purposes of operating the alleged "business opportunity," and the amount they recovered as commissions or other payments. Jia has lost over $1,200, while Sormillon lost in excess of $600. The losses were proximately caused by the actions described in this Count, and may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme.

196.   The precise amount lost by the class sought to be certified has not yet been determined but is believed to be significant.  It is believed that each of the unwitting participants in the pyramid scheme sought to be certified as a class has lost $50 to well over $5,000 as a result of purchasing their Brand Partner distribution rights.  Upon information and belief, the precise amounts that each and every participant in the pyramid scheme has spent on (1) costs associated with the Brand Partner "business opportunity" and (2) has received in commissions or bonuses or other payments from Nerium as a result has been tracked, maintained and accounted for by Nerium through a proprietary software database.  Thus, the precise loss of every class member is easily capable of being ascertained in this litigation, and the total business injury capable of being computed for the class.

197.   The predicate acts set forth in this Count each were mailings and/or wire transmission of material in furtherance of the promotion of the pyramid scheme. Each of these predicate acts was intended to falsely convey the impression to people like Plaintiffs that participation as a Nerium Brand Partners was legal; that they had a reasonable opportunity to make money; that people just like them were able to make generous income; and that the commissions or bonuses they would receive would come from the sale of desirable product. The loss suffered by the

Plaintiffs and the class was foreseeable and a direct result of the establishment, promotion, and expansion of the pyramid scheme by the Defendants named in this Count. A pyramid scheme depends on continued expansion by continual recruiting of innocent people who do not realize that the only way in which they can achieve the benefits represented by the pyramid scheme's promoters is to recruit and victimize other innocent people into joining.  In reality, like all pyramid schemes, the Compensation Plan and all aspects of the promotion of the pyramid scheme were based on recruiting over product sales, and depended on the known existence of money-losers (like the Plaintiffs and the class) to pay the small group of "winners" inherent in any pyramid scheme. There is a clear causal connection between the promotion and recruiting predicate acts alleged above and the injury suffered by the Plaintiffs and the class.

198.   The predicate acts attributed to Nerium, Jeff, Renee, and Amber, also include the creation and dissemination of the Compensation Plan. Under the Nerium Compensation Plan, as set forth above, innocent participants could only make money by recruiting others who in turn would recruit others. This was a necessary feature of the Plan, understood as such by all of the Defendants named in this Count. It was the goal of each of these Defendants that Plaintiffs subscribe, by the payment of money to Nerium, to the Compensation Plan. The payment of bonuses and commissions to promoters who were recruiters of participants in the pyramid scheme, like the Plaintiffs and the class, was an intended part of the Nerium Compensation Plan. Each of the named Plaintiffs were placed by Nerium in a pyramid "downline" whose top slot was occupied by Jeff.  Each of the payments made by the Plaintiffs to purchase Brand Partner distribution rights and product, as well as payments they made for website usage, resulted in payment of a bonus or commission payment that was made, directly or indirectly, to Nerium, Jeff, Renee, and Amber, directly authorized and/or approved of the dissemination of the Nerium compensation plan that was made a part of the Brand Partner distribution rights

purchased by the Plaintiffs. The dissemination of the Nerium compensation plan, together with predicate acts that purported to falsely emphasize the features of the compensation plan (for example, without revealing that under the plan there would be many more "losers" than "winners") was in furtherance of the scheme. Plaintiffs lost money by participating in the compensation plan. But for the illegal nature of the bonus and commission payments set forth by the compensation plan, Plaintiffs and others would not have lost money. Plaintiffs' losses thus were a direct and proximate cause of their intended participation in the compensation plan authored and/or approved by each of these Defendants.

199. A pyramid scheme depends on recruitment of innocent people. The predicate acts attributed to the promoter Defendants are primarily those that concern the promotion of the scheme and luring innocent people to join the business opportunity. The promoters had an incentive to spread the word. The payment of bonuses and commissions to promoters who were recruiters of more participants was part of the scheme. In 2013 to 2016, many of the other promoters were named a directors eligible to collect revenue from company-wide sales, including sales made to new recruits like Jia and Sormillon. It is believed that these individuals were also Plaintiffs' "uplines," and therefore these individuals also received a commission payment, either directly by virtue of being in Plaintiffs' "upline" or indirectly, from the money paid by Plaintiffs. But for the illegal nature of the bonus and commission payments set forth by the "business opportunity" and the recruiting materials, ads or promotions made by these Defendants, directed to Plaintiffs and members of the class who were invited to meetings such as those attended by the Plaintiffs, Plaintiffs and others would not have lost money. The dissemination of the Nerium "business opportunity," by these Defendants together with predicate acts that purported to spread the impression that joining the Nerium "business opportunity" or that resulted in the recruitment of Plaintiffs, directly or indirectly, proximately caused Plaintiffs' and the class losses.

200.   Jeff/Renee/Amber: (1) serving as the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and disseminating countless promotional materials, videos, and public appearances designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual arrangements with third persons to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme, (6) acting as the "top" distributor and accepting tens of millions of dollars as gains from the pyramid scheme.

201.   Shouhed/Hefernan: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Jeff/Renee/Amber upon becoming a Nerium distributor; (2) performing recruiting acts on behalf of Nerium and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when they knew that their own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

202.   The Defendants named in this Count used false and fraudulent means and conducted their affairs unlawfully, intentionally, willfully and with the intent to defraud, for their own financial gain and benefit and for the financial gain and benefit of others, all to the detriment of Jia, Sormillon, and others that purchased the Brand Partner program.

203.   Each of the Defendants named in this Count has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs and the class by his or her actions.

**COUNT VI**

**(RICO 18 U.S.C. § 1962(c) AND ARE IN VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(d))**

(Plaintiffs on behalf of themselves and the Class Against All Defendants including DOES 1 through 10)

204.   Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

205.   Plaintiffs re-state the previous paragraphs as if fully set forth here.

206.   Each of the Defendants named in this Count have participated in a conspiracy to violate Count Five.

207.   Each of the Defendants named in this Count has participated in the pyramid scheme and their participation is necessarily a combination of more than two individuals.

208.   The roles of all of the Defendants named in this Count are set forth in Count V.

209.   Defendants' and nonparty entities' creation, support or maintenance of the pyramid scheme is illegal.

210.   The Defendants named in this Count had a meeting of the minds on the object or course of action, specifically to create, support and maintain the pyramid scheme for their financial benefit as evidenced by each Defendant's voluntary and knowing participation in the pyramid scheme. These agreements and understandings are described in Count V.

211.   Each of the Defendants named in this Count and others have committed one or more overt acts to achieve or further the unlawful objects and purposes of the pyramid scheme detailed herein. They include the following:

212.   Jeff/Renee/Amber: (1) serving as the co-founders and principal creators of the pyramid scheme, (2) creating and/or approving the creation of the Compensation Plan which pays primarily for recruiting, (3) creating and

disseminating countless promotional materials, videos, and public appearances designed to further and expand the pyramid scheme in the United States and abroad, (4) making contractual arrangements with third persons to provide capital to expand the pyramid scheme and to lend the scheme an air of legitimacy, (5) making deals with professional network marketers to pay them hidden inducements and/or assign them "downlines" as an inducement to further the expansion of the pyramid scheme, (6) acting as the "top" distributor and accepting tens of millions of dollars as gains from the pyramid scheme.

213.   Shouhed/Hefernan: (1) accepting payments and/or other inducements, including being given or assigned a "downline" by Jeff/Renee/Amber upon becoming a Nerium distributor; (2) performing recruiting acts on behalf of Nerium and the enterprise when he knew or reasonably should have known that he was promoting a pyramid scheme, (3) appearing in print and electronic promotions to give legitimacy to the idea that anyone could achieve six- and seven- figure success in the "business opportunity" when they knew that their own success and financial payments were the result of hidden arrangements that would not be made available to persons who were being recruited.

214.   The Defendants named in this Count used false and fraudulent means and conducted their affairs unlawfully, intentionally, willfully and with the intent to defraud, for their own financial gain and benefit and for the financial gain and benefit of others, all to the detriment of Jia, Sormillon and others that purchased the Brand Partners. These acts, intent and losses are set forth in Count V.

215.   Each of the Defendants named in this Count has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs and the class by his or her actions.

# COUNT VII

## (Federal Securities Fraud)

(Plaintiffs on behalf of themselves and the Class Against All Defendants including DOES 1 through 10)

149.   Plaintiffs reallege all allegations as if fully set forth herein, and incorporate previous allegations by reference.

150.   In the alternative to Counts Five and Six, and without prejudice to their position that Counts Five and Six are not preempted by the PSLRA, Plaintiffs in Count Seven allege violations of the securities laws.

151.   Only to the extent Defendants contend that Plaintiffs' purchases of starter kits,  payment of fees, and purchases of Nerium products constitute investments in unregistered securities (the sale of which would be a past and continuing violation of federal securities laws), and only if Defendants are successful in obtaining a dismissal for judgment against Plaintiffs' RICO claims on the grounds that the PSLRA preempts their RICO claims, Plaintiffs contend that their purchases of starter kits, payment of monthly fee, and purchases of Nerium products constitute investments in securities.

152.    Nerium made numerous material omissions in its Policies regarding retail sales to the Plaintiffs. Nerium represented that retail sales were a significant part of Defendants' revenues.  Also Nerium represented as follows:

- You can receive a "live better bonus of $150,000."
- "With Nerium International, you can have everything."  Further, "[o]ur program allows you the life-changing career to tailor your career to unlimited success, your way... They incentivize you to become the best person you can be...  I quickly earned my Lexus...  I got an i-pad bonus… You can pay off your student loans…  I wanted to retire my parents."
- You "get paid to party." The representation "[i]f you want your future on your terms, get with your referring brand partner for more information."

- CEO Jeff Olson claims, "[w]e have people who've earned their iPads, they've earned their cars, earned dream vacations, great incomes, six figure incomes, people making adult incomes, people making incomes that put them in the top 5 percentile of the United States."

- "When you don't worry about money anymore, you don't have to stress out over the bills, you know it's about the choices you have – the freedom you have."

- "Nerium has just completely changed my life; everything about my life has gotten completely 100% better. We recently purchased our dream home and it's absolutely gorgeous."

153.   Further, Nerium made false income disclosures in 2013 that were misleading affirmatively, and by omission.

154.   Nerium also made misrepresentations to Plaintiffs (affirmatively and by omission) in the Compensation plans attached hereto as Exhibit A and Exhibit B, respectively, as well as the guide attached hereto as Exhibit D.

155.   These statements are misleading because they fail to inform Distributors that "retail sales," particularly as defined in the Policies, are not a true viable way of earning income because Brand Partners are extremely unlikely to make significant "retail sales," and because the only realistic way to make money in the Nerium scheme is through recruiting.

156.   Nerium made material omissions in its Policies regarding Brand Partners' ability to earn money.  In the Policies, Nerium informed its Brand Partners that they do not even need to be good at sales, and they can still earn money.

157.   This statement is misleading because it fails to inform Brand Partners that very few Brand Partners are likely to earn any profit from participating in Nerium, regardless of how much work they put in and regardless of what part of the country they live in.

158.   By making affirmative statements regarding retail sales and the ability

of Brand Partners to earn income, Nerium undertook an affirmative obligation to make the disclosures necessary to make such statements not misleading.

159.   Nerium made these omissions knowing that doing so was false and misleading.  Nerium benefitted in a concrete and substantial way from the operation of the pyramid scheme, the recruitment of new Brand Partners, and new Brand Partner's reliance on Nerium's omissions.

160.   Nerium made these omissions with the specific intent that Brand Partners rely on them.

161.   Plaintiffs' and the Class Members' reliance on the omissions may be presumed.

## EIGHTH COUNT

### Unjust Enrichment

(Plaintiff on behalf of herself and the Classes Against Defendants Jeff, Renee, Amber, including DOES 1 through 10)

162.   Plaintiff and the classes repeat and re-allege every allegation above as if set forth herein in full.

149.   Unjust enrichment occurs when a Plaintiff confers a benefit to the defendant, the Defendant accepts and retains the benefit, and Defendant does not pay the Plaintiff the value of the benefit.

150.   The Individual Defendants named in this Count have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the members of the class in that the financial benefits obtained by them came as a result of their promotion of the unlawful pyramid scheme. The financial benefits they obtained came from the Plaintiff and the members of the class, who unwittingly participated in the pyramid scheme and naturally and inevitably lost money in the process. The unjustly-obtained benefits are comprised of the following three categories of gains.

151.   First, the Individuals Defendants named in this Count made contractual agreements with each other and with other third-parties that depended on the success

of the pyramid scheme.  The Individual Defendants took active steps to expand the scope of the pyramid scheme, and increased the number of participants—and therefore the number of inevitable "losers" in order to maximize the amounts each would get.  These Defendants were able to obtain payouts under the contracts on the backs of the Plaintiffs.

152.   Second, the Individual Defendants, together with their controlled entities, their children, and other parties have each been enriched in significant amounts as a result of the performance of their various illegal duties. Regardless of in what year, each of the Individual Defendants were "upline" from the Plaintiff and the class, and thus, as a matter of the compensation plan implemented by Nerium, obtained bonuses and commissions, which were necessarily funded by a portion of the Plaintiff's (and the classes) purchase of distributorships, and purchase of product. These payments were thus, directly funded by the Plaintiff by virtue of the compensation system paying commissions and bonuses "upline" to promoters at the top of the pyramid. The value of these benefits can be computed but is presently unknown. But for the illegal Compensation Plan and the commission of the illegal pyramid scheme, the Individual Defendants could not have obtained the funds that came to them via the Compensation Plan.

153.   Third, in addition to the unjust benefits, Jeff, Renee, and Amber have obtained as a result of being upline at the top of the Nerium Pyramid, they have also received a compensation in an amount equaling in the millions based on their executive position in the pyramid scheme. The monies that they received, in part to pay these salaries, came from Plaintiff's (or the class) payments for the same reasons as set forth above.

154.   The revenue that resulted in these payments came directly from the payments made by Plaintiff and the class. It would be unjust to permit these Defendants to retain these ill-gotten gains.

1

**PRAYER FOR RELIEF**

2      The named Plaintiffs and the Plaintiffs' class and subclasses request the

3   following relief:

4      a.      Certification of the class and subclasses;

5      b.      A jury trial and judgment against Defendants;

6      c.      Rescission of the agreements, invoices, open accounts, receipts, and

7   open book accounts, upon which the scheme is based, and recovery of all

8   consideration paid pursuant to the scheme, less any amounts paid or consideration

9   provided to the participant pursuant to the scheme;

10      d.      Damages for the financial losses incurred by Plaintiffs and by the class

11   and subclasses because of the Nerium and the Individual Defendants' conduct and

12   for injury to their business and property;

13      e.      Restitution and disgorgement of monies;

14      f.      Temporary and permanent injunctive relief enjoining Nerium from

15   paying its Distributors recruiting rewards that are unrelated to retail sales to ultimate

16   users and from further unfair, unlawful, fraudulent and/or deceptive acts;

17      g.      The cost of suit including reasonable attorneys' fees under California

18   Code of Civil Procedure § 1021.5, Civil Code §1689.2, and otherwise by law;

19      h.      Punitive damages;

20      i.      Treble damages pursuant to RICO;

21      j.      For damages in an amount yet to be ascertained as allowed by law; and

22      k.      For such other damages, relief and pre- and post-judgment interest as

23   the Court may deem just and proper.

24   ///

25   ///

26   ///

27   ///

28   ///

1

Dated:  August 1, 2017          By: */s/ Blake J. Lindemann*

2

3          **LINDEMANN LAW FIRM, APC**
           BLAKE J. LINDEMANN, SBN 255747
           433 N. Camden Drive, 4th Floor

4          Beverly Hills, CA 90210
           Telephone:  (310)-279-5269

5          Facsimile:  (310)-300-0267
           E-mail:     blake@lawbl.com

6

7          Attorneys For Plaintiffs
           HELEN JIA, SARAH SORMILLON, AND ALL

8          THOSE SIMILARLY SITUATED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiffs Helen Jia and Sarah Sormillon, on behalf of themselves, and those

3    similarly situated, hereby request a jury trial on all matters so triable.

4

5    Dated:  August 1, 2017          By: */s/ Blake J. Lindemann*

6                                            **LINDEMANN LAW FIRM, APC**
                                        BLAKE J. LINDEMANN, SBN 255747
7                                       433 N. Camden Drive, 4th Floor
                                        Beverly Hills, CA 90210
8                                       Telephone:  (310)-279-5269
                                        Facsimile:   (310)-300-0267
9                                       E-mail:      blake@lawbl.com

10

11                                      Attorneys For Plaintiffs
                                        HELEN JIA, SARAH SORMILLON, AND ALL
12                                      THOSE SIMILARLY SITUATED

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28