# United States District Court
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HELEN JIA, an individual, and SARAH SORMILLON, an individual, and all those similarly situated,<br>    Plaintiffs,<br><br>v.<br><br>NERIUM INTERNATIONAL LLC, et al.,<br>    Defendants. | § § § § § § § § § § § | CASE NO. 3:17-CV-03057-S |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants' Motion to Compel Arbitration and Dismiss or Stay Action [ECF No. 71]. For the reasons that follow, the Court grants the Motion.

## I. BACKGROUND OF THE CASE

Per Special Order 3-319, this case was transferred from the docket of Judge Ed Kinkeade to the docket of this Court on March 12, 2018.

Plaintiffs Helen Jia and Sara Sormillon (collectively, the "Plaintiffs") bring this action against Nerium International LLC ("Nerium"); Nerium Skincare, Inc.; Nerium Biotechnology, Inc.; and Natural Technology, Inc. (collectively, the "Corporate Defendants"); and Nerium Chief Executive Officer, Jeff Olson; Nerium Chief Leadership Officer, Renee Olson; Nerium Chief Marketing Officer, Amber Olson Rourke; and Michael Shouhed (collectively, the "Individual Defendants" and collectively with the Corporate Defendants, the "Defendants").[1]

---

[1] According to Defendants, the Olsons join Nerium in the Motion because the Arbitration Policy covers all disputes against Nerium and its officers, directors, and employees. Mot. 1-2 n.2. Shouhed does not join in the Motion, but accepts the jurisdiction of Texas, and agrees to arbitrate the case before the American Arbitration Association ("AAA"). *Id.* Nerium Skin Care, Inc., Nerium Biotechnology, Inc., and Natural Technology, Inc. have not yet entered appearances in this action and, according to Defendants, have not yet been served. *Id.*

1

Jia became a Nerium Brand Partner ("Brand Partner") in August 2013. Third Am. Compl. ¶ 100. Sormillon became a Brand Partner in September 2016. *Id.* ¶ 101; Mot. 5. Nerium sells skincare and other products through a network of Brand Partners. Mot. 5. Brand partners are independent, non-exclusive distributors of Nerium skincare products. *Id.* at 3. According to Defendants, "Nerium's direct-sales model allows Brand Partners to earn money both by selling products and by recruiting new Brand Partners who, in turn, also sell products." *Id.* at 5. "Brand Partners receive commissions from the sales of the Brand Partners they recruit, and each Brand Partner whom those recruits in turn recruit, and so forth." *Id.* Plaintiffs, however, allege that Nerium generates its revenue using a "product-based pyramid scheme." Third Am. Compl. ¶ 37.

Defendants move to compel arbitration of all claims asserted against them by Plaintiffs and to dismiss the lawsuit, or in the alternative, to stay the lawsuit pending resolution of the arbitration process. Mot. 1. According to Defendants, the Brand Partner relationship is governed by a series of agreements, including Nerium's Policies and Procedures (the "Policies") and Terms of Agreement (the "Terms" and collectively with the Policies, the "Agreements"). *Id.* at 1, 5. Defendants assert that enrollment as a Brand Partner requires submitting an application to Nerium and executing an Electronic Signature Agreement, which includes clicking "I agree" to, among other things, the Agreements. *Id.* at 5.

When Sormillon enrolled as a Brand Partner online on September 23, 2016, the Policies contained an Arbitration Provision set forth as § 11.09(a). *Id.* at 5-6. Section 11.09(a) reads as follows:

> Except as expressly set forth herein, all disputes, claims or causes of action relating to or arising from any Independent Brand Partner Application, Nerium International Terms of Agreement, Company's Policies and Procedures, and any other Company policies, products and services, the rights and obligations of Company and Brand Partner or any other disputes, claims, or causes of action between Brand Partner and any of its officers, directors, employees, affiliates and

2

> Company or any of its officers, directors, employees or affiliates whether in tort or contract, shall be settled totally and finally by arbitration in Dallas, Texas, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including the option rules for emergency measures of protection which Company may use, in addition to or instead of the procedures set forth in section (c) below. The arbitration shall be conducted before a single arbitrator and shall not be conducted on a class-wide, class action or multiple complaining-party basis.

Defs.' App. 065 § 11.09(a).

In addition, the Terms contained a Dispute Resolution Provision (collectively with the Arbitration Provision, the "Arbitration Policy") reaffirming a Brand Partner's agreement to arbitrate any dispute under Texas law. Mot. 6-7. The Dispute Resolution Provision is set forth as § 12 and reads as follows:

> DISPUTE RESOLUTION: Any and all disputes regarding, or related to, this agreement, and all other documents incorporated herein, shall be governed and construed in accordance with the laws in the State of Texas, and shall be resolved by binding arbitration administered by the American Arbitration Association ("AAA") and conducted under its rules, and the arbitration proceeding shall be held in Dallas County, Texas, as is more particularly set forth in Section 11.09 of the NERIUM INTERNATIONAL Policies and Procedures Manual.

Defs.' App. 073 § 12.

When Jia enrolled online as a Brand Partner on August 9, 2013, she agreed to the same Arbitration Provision in the Policies as Sormillon. Mot. 7; *see also* Defs.' App. 032 § 11.09(a). Additionally, the Terms contained an identical Dispute Resolution Provision, except for a typographical error referencing § 11.06 of the Policies instead of § 11.09. Mot. 8 n.5; *see also* Defs.' App. 040 § 12.

Plaintiffs oppose the Motion, alleging that their claims are not subject to arbitration. According to Plaintiffs, the Motion should be denied because (1) Plaintiffs did not assent to the Arbitration Policy, (2) the Agreements are illusory, (3) Nerium's right to compel arbitration expired, (4) the factual allegations fall outside the scope of the Arbitration Policy, (5) the

Agreements are unconscionable, (6) contracts void against public policy cannot be compelled to arbitration, and (7) the Arbitration Policy improperly limits Plaintiffs' statutory rights. *See* Resp. 8-21.

## II. LEGAL STANDARD

Pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1, *et seq.*, written arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides that a party seeking to enforce an arbitration provision may petition the court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* § 4.

Enforcement of an arbitration agreement involves two analytical steps. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). The first is contract formation—whether the parties entered into any arbitration agreement at all. *Id.* The second involves contract interpretation to determine whether the claim is covered by the arbitration agreement. *Id.* Ordinarily, both steps are questions for the court. *Id.* (citing *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003). But where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes. *Id.* Delegation clauses are enforceable and transfer the Court's power to decide arbitrability questions to the arbitrator. *Id.* at 201-02. Thus, a valid delegation clause requires the Court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues. *Id.* at 202 (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)).

If the party seeking arbitration points to a purported delegation clause, the Court's analysis is limited. *Id.* It performs the first step—an analysis of contract formation—as it always does. *Id.* But the only question, after finding that there is in fact a valid agreement, is whether the purported

4

delegation clause demonstrates an intent to have the arbitrator decide whether a given claim must be arbitrated. *Id.* If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases. *Id.*

Issues of validity and scope are governed by state-law contract principles. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004). Here, Texas law governs. *See* Defs.' App. 032 § 11.11 ("This Agreement and this Policy Manual shall be governed by the laws of the State of Texas . . . ."); Defs.' App. 065 § 11.11 ("The Agreement, including this Policy Manual, shall be governed by the laws of the State of Texas . . . ."); Resp. 8 ("Under Texas law, a valid contract requires . . . .").

## III. ANALYSIS

### *(1) Contract Formation*

When a party seeks to compel arbitration based on a contract, the first question is whether there is a contract between the parties at all. *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018); *see also Kubala*, 830 F.3d at 201-02. In conducting this inquiry, the Court distinguishes between "validity" or "enforceability" challenges and "formation or existence" challenges. *Homeaway*, 890 F.3d at 550 (citing *Rent-A-Ctr.*, 561 U.S. at 70 n.2; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)). Though the difference between formation and validity may be unclear at the margins, the Supreme Court has suggested that the category of arguments that question the very existence of an agreement include "whether the alleged obligor ever signed the contract." *Id.* (quoting *Buckeye Check Cashing, Inc.*, 546 U.S. at 444 n.1). "[I]t is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract." *Will-Drill Res., Inc.*, 352 F.3d at 218.

5

Under Texas law, a binding contract requires: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding. *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018); *see also USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). The parties dispute whether or not Plaintiff assented to the Arbitration Policy.

The Arbitration Policy at issue involves a clickwrap agreement. "A 'clickwrap agreement' allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the website," and "[i]f the consumer does not accept the terms of the agreement, the website will not complete the transaction." *Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.*, 106 F. Supp. 2d 895, 905 n.15 (N.D. Tex. 2000). It is well established under Texas law that assent through an affirmative "click" is sufficient to bind the parties. *See, e.g., In re Online Travel Co.*, 953 F. Supp. 2d 713, 718-20 (N.D. Tex. 2013) (finding "valid clickwrap agreement" where party was required to assent to terms before progressing in online transaction); *Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 156 (Tex. App.—San Antonio 2006, no pet.) ("By clicking 'I agree to the Terms and Conditions,' the consumer presumably selected to follow through with the contract, consciously aware of the additional terms and conditions and their availability."); *Barnett v. Network Sols., Inc.*, 38 S.W.3d 200, 204 (Tex. App.—Eastland 2001, rev. denied) (upholding forum-selection clause presented as part of online registration agreement because "it was [plaintiff's] responsibility to read the electronically-presented contract, and he cannot complain if he did not do so").

In order to proceed with the online application and enrollment process to become a Brand Partner, Plaintiffs had to click a box to affirm their agreement with the Policies and Terms. Mot.

6

13. Specifically, Plaintiffs were required click a box at the "Checkout" page affirming: "I agree to Nerium International **Terms of Service**." *See* Defs.' Supp. App. 458 (emphasis in original). According to Defendants, the bolded "Terms of Service" contains a hyperlink. *Id.* at 450 ¶ 7. Clicking the "Terms of Service" hyperlink directs a prospective Brand Partner to a webpage with a list of, and links to, the pertinent Brand Partner agreements, including the Electronic Signature Agreement. *Id.* at 450 ¶ 7, 460. Clicking the "Electronic Signature Agreement" hyperlink directs a prospective Brand Partner to the Policies and Terms. *Id.* at 450 ¶ 8. The Policies and Terms are also hyperlinked at the bottom of the webpage. *See id.* at 454, 459, 460. A prospective Brand Partner must, as a condition of enrollment, click the "I agree to Nerium International Terms of Service" box on the "Checkout" page. *See* Defs.' App. 004 ¶ 9; *see also Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 783 (N.D. Tex. 2006) ("Without accepting the terms of the license, installation is impossible. Therefore, the Court finds that the record evidence is sufficient to support the conclusion that [Defendant] could not have incorporated Voyager 2.0.1 in the software without clicking 'Yes' to the terms of the license agreement.") (internal citations omitted). Nerium's online application system recorded both Jia's and Sormillon's enrollment as Brand Partners. Mot. 13; Defs.' App. 008, 042.

Plaintiffs, however, argue that the Arbitration Policy lacks assent. Resp. 8. According to Plaintiffs,

> Although Nerium suggests to the contrary, Nerium does not require a prospective brand partner to agree to an arbitration policy to become a Brand Partner. The electronic "[T]erms of [S]ervice" only relates to signing up for an "edge subscription" and does not in any manner, put a proposed Brand Partner on notice the [T]erms of [S]ervice relate to becoming a distributor. . . . The reference to the [T]erms of [S]ervice was decoupled from the page a prospect selects to become a distributor, and there is no reference to the click wrap, as the terms of service were not included as a hyperlink by Nerium. Fundamentally, the Terms are nowhere referenced in the signup process. . . . The enrollment process does not even mention

7

> the "Policies." Nerium has not submitted admissible evidence suggesting that the "Policies" were agreed to by the Plaintiffs at any time.

*Id.*

The Court finds this argument wholly without merit. First, the screenshots of the "Become a Brand Partner" online enrollment page clearly show that both the Policies and Terms—along with Nerium's return, spam, and privacy policies—are hyperlinked on the bottom of the webpage. *See* Defs.' Supp. App. 454, 459, 460. The screenshots provided by Plaintiffs in the Third Amended Complaint are incomplete and appear to be deliberately cropped in a misleading manner. *Compare* Third Am. Compl. ¶¶ 121-122, *with* Defs.' Supp. App. 452-58. It was Plaintiffs' "responsibility to read the electronically-presented contract[s], and [they] cannot complain if [they] did not do so." *Barnett*, 38 S.W.3d at 204.

Next, Plaintiffs' prior statements in their Third Amended Complaint contradict their argument that they "were not put on notice of the Term[s] or Policies." Resp. 8. Plaintiffs admit in their own Third Amended Complaint that they were presented with, and asked to accept, the Policies (which include the Arbitration Provision), contradicting their argument that they were not put on notice of the Policies:

> Nerium made the then-current version of the Policies available to Plaintiff[s] and the Class Members through Nerium's website at all times, and by mail. Nerium contractually requested Plaintiffs and the Class Members to acknowledge that they had read and reviewed the current version of the Policies at the time they joined Nerium, and to abide by the terms of the current version of the Policies, and to read, understand, and adhere to the current version of the policies.

Third Am. Compl. ¶ 339. Jia also admits that she continued to renew her status as a Brand Partner. *See id.* ¶ 100 ("Plaintiff Jia continued to renew Nerium . . . years thereafter . . ."); *id.* ¶ 331 ("Plaintiff and the classes suffered damages in that they lost monies through the purchase of their Brand Partner Distributorships and each yearly renewal.").

8

Finally, Plaintiffs' claims arise from their status as Brand Partners of Nerium. Their claims presume the existence of a contract. *See, e.g.*, Third Am. Compl. ¶ 100 ("Plaintiff Jia first became a[] Nerium Brand Partner . . . by making purchases and buying the starter pack. Plaintiff Jia continued to renew Nerium . . . years thereafter . . . ."); *id.* ¶ 101 ("Plaintiff Sarah Sormillon became a Nerium Brand Partner in 2016 by making purchases and buying the starter pack."); *id.* ¶ 282 ("Defendants' deceptive act or practice . . . was committed in order to induce Plaintiffs to enter into a contract . . . ."); *id.* ¶ 286 ("Defendants never intended to adhere to the terms of any contract . . . ."); *id.* ¶ 287 ("Plaintiffs seek recovery of economic damages, including . . . benefit-of-the bargain damages . . . ."); *id.* ¶ 326 ("The Defendants had a duty to disclose information to Plaintiffs and the class based on their contractual relationship . . . .").

Plaintiffs cannot have it both ways. They accepted the "business opportunity" that was made available to them only after enrolling as Brand Partners. *See id.* ¶ 100 ("Plaintiff Jia paid between $1200-$1500 towards the opportunity"); *id.* ¶ 101 ("Plaintiff Sormillon paid approximately $600 towards the business opportunity"); *id.* ¶ 102 ("Plaintiffs Jia and Sormillon were unable to make any retail sales, and they lost money in the Nerium scheme despite putting in effort."). Plaintiffs now bring this suit against Defendants for alleged misrepresentations made with respect to that "business opportunity." *See id.* ¶ 104 ("Plaintiffs Jia and Sormillon were deceived by Nerium's misleading opportunity . . . ."). Plaintiffs cannot "su[e] based upon one part of a transaction that [they] say grants [them] rights while simultaneously attempting to avoid other parts of the same transaction that [they] view[] as a burden—namely the arbitration agreement." *Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 268 (5th Cir. 2004).

The Court finds that Defendants have provided sufficient evidence to establish that a contract, including an arbitration provision, exists between the parties. Plaintiffs have provided

no reliable evidence to the contrary—only highly suspect, misleading, and conclusory allegations. Assent through an affirmative "click" is sufficient to bind the parties under Texas law.

*(2) Scope of the Arbitration Policy*

The second step for the Court in considering a motion to compel arbitration is to determine whether the claim at issue falls within the scope of the arbitration agreement. *Kubala*, 830 F.3d at 201. But if the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes. *Id.* The presence of a delegation clause requires the Court to inquire: Who should have the primary power to decide whether the claim is arbitrable? *Id.* at 201-02. Delegation clauses are enforceable and transfer the Court's power to decide arbitrability questions to the arbitrator. *Id.* at 202. Therefore, a valid delegation clause requires the Court to refer a claim to arbitration to decide gateway arbitrability issues. *Id.* "Gateway" questions of "arbitrability" include whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. *Rent-A-Ctr.*, 561 U.S. at 68-69. If a party seeking arbitration points to a purported delegation clause, the Court's analysis is narrowed. *Kubala*, 830 F.3d at 202. The Court performs the first step—an analysis of contract formation—as it always does. *Id.* Following Fifth Circuit case law, "[T]he only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id.*

Defendants contend that the Policies and Terms both contain a delegation clause. *See* Mot. 9 ("The Policies and Procedures and Terms of Agreement expressly provide that the parties will resolve any dispute between them by way of arbitration before the AAA, under the AAA's Commercial Arbitration Rules. By incorporating the AAA's rules, the parties clearly and

10

unmistakably delegated questions of arbitrability to the arbitrator . . . ."). Under the FAA, parties are free to delegate questions to an arbitrator, including questions regarding the validity and scope of the arbitration provision itself. *Homeaway*, 890 F.3d at 551 (citing *Rent-A-Ctr.*, 561 U.S. at 68-70). However, the Court may not assume that parties have agreed to arbitrate threshold issues absent clear and unmistakable evidence of their intent to do so. *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995)).

The Fifth Circuit has held that, generally, stipulating that the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules") will govern the arbitration of disputes constitutes such "clear and unmistakable" evidence. *Id.* (citing *Petrofac, Inc. v. Dyn-McDermott Petroleum Operations Co.*, 687 F.3d 671, 674-75 (5th Cir. 2012)). The AAA Rules state, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AM. ARBITRATION ASS'N, COMMERCIAL ARBITRATION RULES & MEDIATION PROC. R-7(a) (2013), https://www.adr.org/rules.

Here, the Arbitration Provision in the Policies explicitly stipulates that the AAA Rules will govern the arbitration of disputes:

> Except as expressly set forth herein, all disputes, claims or causes of action relating to or arising from any Independent Brand Partner Application, Nerium International Terms of Agreement, Company's Policies and Procedures, and any other Company policies, products and services, the rights and obligations of Company and Brand Partner or any other disputes, claims, or causes of action between Brand Partner and any of its officers, directors, employees, affiliates and Company or any of its officers, directors, employees or affiliates whether in tort or contract, *shall be settled totally and finally by arbitration in Dallas, Texas, in accordance with the Commercial Arbitration Rules of the American Arbitration Association*, including the option rules for emergency measures of protection which Company may use, in addition to or instead of the procedures set forth in section (c) below.

11

Defs.' App. 032 § 11.09(a), 065 § 11.09(a) (emphasis added). The Dispute Resolution Provision in the Terms also stipulates that the arbitration shall be conducted under the AAA Rules:

> DISPUTE RESOLUTION: Any and all disputes regarding, or related to, this agreement, and all other documents incorporated herein, shall be governed and construed in accordance with the laws in the State of Texas, and ***shall be resolved by binding arbitration administered by the American Arbitration Association ("AAA") and conducted under its rules***, and the arbitration proceeding shall be held in Dallas County, Texas, as is more particularly set forth in Section 11.09 of the NERIUM INTERNATIONAL Policies and Procedures Manual.

*Id.* at 040 § 12, 073 § 12 (emphasis added). Accordingly, the Court finds that there is clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability and scope to the arbitrator.

Plaintiffs, however, argue that the "wholly groundless" exception applies in this case. Regardless of whether an agreement clearly and unmistakably delegates the question of arbitrability, the Fifth Circuit provides a "narrow escape valve" when the assertion of arbitrability is "wholly groundless." *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 878 F.3d 488, 495 (5th Cir. 2017). An assertion of arbitrability is "wholly groundless" when there is no plausible argument for the arbitrability of the dispute. *Id.* at 492. The Fifth Circuit has cautioned that the "wholly groundless" exception is a narrow one and "is not a license for the court to prejudice arbitrability disputes more properly left to the arbitrator pursuant to a valid delegation clause." *Id.* at 495 (quoting *Kubala*, 830 F.3d at 202 n.1).

> An assertion of arbitrability is not "wholly groundless" if there is a legitimate argument that the arbitration clause covers the present dispute, and, on the other hand, that it does not. If a court can find a plausible argument that the arbitration agreement requires the merits of the claim to be arbitrated, the wholly groundless exception will not apply.

*Id.* (internal citations and quotations omitted).

The Fifth Circuit initially adopted the "wholly groundless" exception in *Douglas v. Regions Bank*, 757 F.3d 460, 464 (5th Cir. 2014), and most recently applied it in *Archer*.[2] *Id.* at 492. In *Archer*, the Fifth Circuit held that the "wholly groundless" exception applied, and that it was for the court, and not the arbitrator, to decide the question of arbitrability. *Id.* at 497. The arbitration clause at issue in *Archer* read:

> Disputes. This Agreement shall be governed by the laws of the State of North Carolina. Any dispute arising under or related to this Agreement *(except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property of Pelton & Crane)*, shall be resolved by binding arbitration in accordance with the arbitration rules of the American Arbitration Association. The place of arbitration shall be in Charlotte, North Carolina.

*Id.* at 491 (emphasis added). The Fifth Circuit noted that the arbitration clause created a carve-out for actions seeking injunctive relief, one type of relief requested by the plaintiff in the suit. *Id.* at 491, 497. While noting that *Douglas* is a recent case and the contours of the "wholly groundless" exception were not yet fully developed, the Fifth Circuit stated, "[I]f the doctrine is to have any teeth, it must apply where, as here, an arbitration clause expressly excludes certain kinds of disputes." *Id.* at 497. The Fifth Circuit ultimately held, "We see no plausible argument that the arbitration clause applies here to an 'action seeking injunctive relief.'" *Id.*

Plaintiffs argue, "Like in *Archer*, Plaintiffs here have asserted that their claims cannot be pursued in arbitration because the arbitration/delegation provision at issue in this case, Policies [§] 11.09(c) and [§] 11.09(d), prohibits Plaintiffs from seeking injunctive relief and carves out injunctive relief from arbitration." Pls.' Surreply 2. According to Plaintiffs, "[T]he delegation provision is inapplicable under *Archer* because injunctive relief is impermissibly carved out of the delegation/arbitration provision." *Id.*

---

[2] The United States Supreme Court recently granted certiorari in *Archer* on June 25, 2018. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 138 S. Ct. 2678 (2018).

13

The Court finds that the case at hand is distinguishable from *Archer*, and the wholly groundless exception should not apply. Unlike *Archer*, the plain language of the Arbitration Policy in the Policies and Terms does not create a "carve-out clause remov[ing] the disputes from the ambit of both arbitration and the AAA Rules." *Archer*, 878 F.3d at 493. The Arbitration Provision in the Policies states:

> Except as expressly set forth herein, ***all disputes, claims or causes of action*** relating to or arising from any Independent Brand Partner Application, Nerium International Terms of Agreement, Company's Policies and Procedures, and any other Company policies, products and services, the rights and obligations of Company and Brand Partner or any other disputes, claims, or causes of action between Brand Partner and any of its officers, directors, employees, affiliates and Company or any of its officers, directors, employees or affiliates whether in tort or contract, ***shall be settled totally and finally by arbitration in Dallas, Texas, in accordance with the Commercial Arbitration Rules of the American Arbitration Association***, including the option rules for emergency measures of protection which Company may use, in addition to or instead of the procedures set forth in section (c) below.

Defs.' App. 032 § 11.09(a), 065 § 11.09(a) (emphasis added).[3] The Arbitration Provision does go on to address injunctive relief in a later paragraph. Section 11.09(c) reads, in pertinent part:

> Nothing in this rule shall prevent the Company from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to safeguard and protect the Company's interests prior to the filing of or during or following any arbitration or other proceeding or pending the handing down of a decision or award in connection with any arbitration or other proceeding.

*Id.* 032 § 11.09(c), 065 § 11.09(c).

---

[3] Although not challenged by Plaintiffs in their briefing, the Dispute Resolution Provision similarly states:

> DISPUTE RESOLUTION: ***Any and all disputes*** regarding, or related to, this agreement, and all other documents incorporated herein, shall be governed and construed in accordance with the laws in the State of Texas, and ***shall be resolved by binding arbitration administered by the American Arbitration Association ("AAA") and conducted under its rules***, and the arbitration proceeding shall be held in Dallas County, Texas, as is more particularly set forth in Section 11.09 of the NERIUM INTERNATIONAL Policies and Procedures Manual.

Defs.' App. 040 § 12, 073 § 12 (emphasis added).

14

Unlike *Archer*, the delegation clause and any language addressing injunctive relief are not in the same sentence, or even in the same paragraph. This is not a case where "the interaction between the AAA Rules and the carve-out is at best ambiguous." *Archer*, 878 F.3d at 494-95. The plain language of the Arbitration Provision dictates that "*all disputes, claims or causes of action*" must be settled by arbitration and in accordance with the AAA Rules.

Moreover, Plaintiffs are not prohibited from seeking injunctive relief in arbitration. The Arbitration Provision allows Nerium to seek injunctive relief to protect its interests "prior to the filing of or during or following any arbitration or other proceeding or pending the handing down of a decision or award." Defs.' App. 032 § 11.09(c), 065 § 11.09(c). However, nothing in the Agreements precludes any party from seeking injunctive relief in the arbitration proceeding. Furthermore, the AAA Rules, which the parties expressly invoke in the Arbitration Policy, provide that an arbitrator may award injunctive relief. *See* AM. ARBITRATION ASS'N, COMMERCIAL ARBITRATION RULES & MEDIATION PROC. R-37(a) (2013), https://www.adr.org/rules ("The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief . . . ").

The wholly groundless exception is a narrow one. Given the plain language of the Arbitration Provision and the Court's finding that Plaintiffs are not precluded from seeking injunctive relief in arbitration, the Court finds that there is a "plausible argument that the arbitration agreement requires the merits of the claim to be arbitrated." *Archer*, 878 F.3d at 492. Both the Arbitration Provision and Dispute Resolution Provision incorporate the AAA Rules, evincing clear and unmistakable evidence of the parties' intent to delegate threshold questions to an arbitrator, including questions regarding the validity and scope of the arbitration provision itself. Therefore,

it is for the arbitrator, and not the Court, to decide threshold questions, including the scope of the arbitration.

### *(3) Enforceability*

Plaintiffs make numerous other challenges to the enforceability of the arbitration agreement, including that the Agreements are illusory, Nerium's right to compel arbitration expired, Plaintiffs' allegations fall outside the scope of the Arbitration Policy, and the Agreements are unconscionable, among others. *See* Resp. 8-21. However, Plaintiffs do not specifically challenge the enforceability of the delegation clause. *See, e.g., id.* at 2 ("The purported contractual documents at issue here bear the same fundamental flaw and unilateral right to amend, and are thus, illusory and unenforceable."); *see also id.* at 3 ("[T]he arbitration policy is unconscionable because Nerium is permitted a non-mutual right to litigate, the costs of arbitration are excessive relative to the amount in controversy, injunctive relief is precluded, and there are limitation of damage provisions."). Beyond the argument that the "wholly groundless" exception should apply, Plaintiffs do not contest the validity of the delegation clause in particular.

In the absence of a challenge specifically to a delegation clause, validity and enforceability challenges must be sent to the arbitrator. *Homeaway*, 890 F.3d at 554 (citing *Rent-A-Ctr.*, 561 U.S. at 71-72). Because the Court finds there is an agreement to arbitrate, a delegation clause, and no specific challenge to that delegation clause, Plaintiffs' additional arguments are for an arbitrator to resolve. *See id.*

## IV. CONCLUSION

For the reasons outlined above, Defendants' Motion to Compel Arbitration and Dismiss or Stay Action is granted. The Court finds that an agreement, including an arbitration provision, exists between the parties. The Arbitration Policy incorporates the AAA Rules, evincing clear and

16

unmistakable evidence of the parties' intent to have the arbitrator decide whether a given claim must be arbitrated. Any challenges to the enforceability or scope of the Arbitration Policy must be decided by the arbitrator. This action will be stayed and administratively closed pending the outcome of arbitration. *See* 9 U.S.C. § 3. The Court directs the Clerk of Court to administratively close this case until such time as the Court orders it to be reopened.

**SO ORDERED.**

SIGNED September 18, 2018.

_____
KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE